UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In Re: | ) | CASE NO.  09-02083-jw |
| | ) | |
| Inlet Retail Associates, LLC | ) | CHAPTER  11 |
| | ) | |
| Debtor. | ) | Adversary Complaint No.: |
| | ) | |
| Inlet Retail Associates, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | (Non-Jury) |
| vs. | ) | |
| | ) | |
| Regal Cinemas, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now comes Plaintiff Inlet Retail Associates, LLC ("Inlet Retail" or "Debtor")) complaining of the above-named defendant as follows:

## PARTIES AND JURISDICTION

1.    Plaintiff Inlet Retail is a South Carolina limited liability company with its principle place of business in Horry County, South Carolina.  The Debtor commenced this case by filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code in this Court on March 19, 2009.

2.    Upon information and belief, Defendant Regal Cinemas, Inc. ("Regal") is a Tennessee corporation and the successor in interest to Litchfield Theatres, Ltd..  Regal conducts business in Horry County, South Carolina and other counties in the State of South Carolina.

3.    This action arises from and is related to the Debtor's case under title 11 of the United States Code, Case Number 09-02083-jw.  This Court has subject matter jurisdiction

1

pursuant to 28 U.S.C. § 1334 and Local Civil Rule 83.IX.01, DSC and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O).

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

5.      Inlet Retail is the owner of Inlet Square Mall in Murrells Inlet, South Carolina.

6.      Litchfield Theatres, Ltd, as predecessor to Regal, entered into a Lease Agreement with Inlet Retail dated February 22, 1989.  This Lease was amended by letters on or about June 19, 1991 and June 16, 1994.  Litchfield Theatres, Inc. merged with Regal in 1997 and Regal became the tenant under the Lease Agreement with Inlet Retail on May 13, 1997.  The Lease Agreement was subsequently amended on July 17, 1997.  The Lease Agreement and all amendments thereto are collectively referred to as the "Lease Agreement."  A copy of the Lease Agreement and all amendments are attached hereto as Exhibit A.

7.      Under the terms of the Lease Agreement, Regal agreed to pay monthly minimum rent and operating and utility expenses in exchange for the right to occupy space in Inlet Square Mall where it operates its movie theatre business.  The Lease Agreement expires on March 31, 2015.  Regal's current base monthly rental obligation is $49,457.46.

8.      Regal has repeatedly failed to pay the monthly minimum rent and operating and utility expenses required under the Lease Agreement and currently owes Inlet Retail $296,744.76 in past rent, fees, and expenses as set forth in the attached Verified Statement of Account.  (See Exhibit B).  Regal has been given written notice of its failure to pay the past due amounts but has failed to pay.  Regal's monthly rental obligation will continue to accrue through March 31, 2015.

## FOR A FIRST CAUSE OF ACTION AGAINST REGAL
(Breach of Contract)

9.      Each and every allegation asserted above is realleged and incorporated by reference.

10.     Inlet Retail and Regal entered into a contract.

11.     Regal breached the contract by failing to pay monthly rent and operating and utility expenses as established by the Lease Agreement.

12.     As a result of breach, Inlet Retail has suffered actual damages which continue to accrue as set forth in the attached verified Statement of Account which is attached as Exhibit B.

## FOR A SECOND CAUSE OF ACTION AGAINST REGAL
(Quantum Meruit)

13.     Each and every allegation asserted above is realleged and incorporated by reference.

14.     Regal has continually occupied space within Inlet Square Mall since the inception of the Lease Agreement.  Moreover, Regal has continuously operated its movie theatre business within Inlet Square Mall since the inception of the Lease Agreement.  Regal, therefore, receives the benefit of operating its business within Inlet Square Mall.

15.     Regal has failed to pay Inlet Retail for the right to occupy space within Inlet Square Mall since March 1, 2009.  It is unjust and inequitable for Regal to occupy space and run its business within Inlet Square Mall but not compensate Inlet Retail for this benefit.

16.     To the extent Inlet's contractual right to be paid rent from Regal under the Lease Agreement is deemed unenforceable, in whole or part, Inlet is entitled to recover the fair and reasonable value of the benefit it has and continues to confer upon Regal.

3

WHEREFORE, Plaintiff Inlet Retail Associate, LLC requests this Court enter a Judgment against Regal Cinemas, Inc. for its actual damages, equitable relief as appropriate, and for such further relief as the Court deems just and proper.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:    /s/ Jody A. Bedenbaugh
      Robert H. Jordan, Fed. I.D. # 6986
      E-Mail: robert.jordan@nelsonmullins.com
      Jody A. Bedenbaugh, Fed ID # 9210
      Email: jody.bedenbaugh@nelsonmullins.com
      151 Meeting Street / Sixth Floor
      Post Office Box 1806 (29402-1806)
      Charleston, SC  29401-2239
      (843) 853-5200

Attorneys for Inlet Retail Associates, LLC

Columbia, South Carolina

August 13, 2009

**AGREEMENT** made as of the *17th* day of ~~June~~ *July*, 1997 between **INLET SQUARE**

**PROPERTIES, L.L.C.**, a California limited liability company having its principal office at c/o Oaktree

Capital Management, LLC, 550 South Hope Street, Los Angeles, California 90071, as landlord (referred

to herein as "Landlord") and **REGAL CINEMAS, INC.**, a Tennessee corporation having an office at

7132 Commercial Park Drive, Knoxville, Tennessee 37918, as tenant (referred to herein as "Tenant").


# W I T N E S S E T H :


**WHEREAS:**


(1)    Under date of February 22, 1989, Landlord's predecessor-in-interest, Coastal

Limited Partnership, and Litchfield Theatres, Ltd., a South Carolina Corporation ("Litchfield") entered

into a lease affecting approximately 25,220 square feet in the shopping center known as Inlet Square

Mall, Horry County, South Carolina (referred to collectively herein as the "Shopping Center"); and


(2)    Said lease, as same may have been modified by various written agreements,

including, but not limited to, agreements dated June 19, 1991 and June 16, 1994 is referred to herein as

the "Lease"; and the premises so leased to Litchfield pursuant to the provisions of the Lease, together

with all appurtenances, fixtures, improvements, additions and other property attached thereto or installed

therein at any time during the Term other than the Tenant's personal property are referred to herein,

collectively, as the "Demised Premises"; and


(3)    On June 15, 1994, Litchfield merged with Regal Acquisition Corporation, a South

Carolina corporation with Litchfield being the surviving corporation; and


MBECK/SMCIN/46521  Ver 5                    -1-                    06/25/97  3:31pm



(4)     On May 13, 1997, Litchfield merged with Tenant, with Tenant being the surviving corporation; and

(5)     Pursuant to the merger of Litchfield into Tenant, Tenant is the tenant under the Lease; and

(6)     Landlord is the successor landlord to Metropolitan Life Insurance Company by virtue of its acquisition of the Shopping Center on December 22, 1995; and

(7)     Tenant now desires to lease and add to the Demised Premises certain space which is indicated on the site plan, identified as Exhibit 1, annexed hereto and made a part hereof on which to construct an addition to the Demised Premises containing approximately 16,125 square feet, and Landlord is willing to lease said space to Tenant, subject to the provisions of this Agreement (said addition, together with all appurtenances, fixtures, improvements, additions and other property attached thereto or installed therein at any time during the Term, other than Tenant's personal property, is referred to herein as the "Additional Space"); and

(8)     The parties desire to record herein their understandings with respect to the foregoing.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

FIRST:     The Lease is hereby modified as follows:

MBECK/SMCIN/46521  Ver 5                    -2-                    06/25/97  3:31pm

a.      Subject to the terms hereof, Landlord hereby consents to the transfer of the tenant's interest in the Lease from Litchfield to Tenant pursuant to the merger of said corporations and Tenant hereby agrees that Tenant is bound by all of the terms, covenants and conditions of the Lease on Tenant's part to be observed and performed all as if Tenant had originally executed the Lease.

b.      Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the Additional Space for a term to commence on the earliest of (i) the date a certificate of occupancy is issued affecting the Additional Space or (ii) the date that Tenant occupies the Additional Space for the conduct of business or (iii) the date which is two hundred seventy (270) days after date of the issuance of the last necessary building permit, site plan approval, zoning approval or other governmental approval to enable commencement of Tenant's Construction [hereinafter defined] (whether or not Tenant has completed Tenant's Construction) and to end on the Expiration Date of the Lease, i.e. March 31, 2015 (by virtue of Tenant's exercise of the first renewal option in accordance with the provisions of Paragraph L of this Article FIRST), unless the Term shall sooner terminate pursuant to any of the terms, covenants or conditions of the Lease or pursuant to law (the date on which the term applicable to the Additional Space shall commence is sometimes referred to herein as the "Additional Space Commencement Date").

c.      Tenant acknowledges that (i) as of the date hereof, the Additional Space consists of common area improvements (i.e. curbing, asphalt and landscaping) and (ii) Landlord has made no representations to Tenant as to the condition of the Additional Space and Tenant agrees to accept possession of the Additional Space in the condition which shall exist on the date hereof "as is" and further agrees that Landlord shall have no obligation to perform any work or make any installations (including, but not limited to, any site work or soil and/or pad preparation) in order to prepare the Additional Space for Tenant's occupancy.

d.    From and after the date hereof (i) Sections 7, 22(b), and 22(c) of the Lease shall be deemed inapplicable to the Additional Space; and (ii) the following new Section 5(e) shall be deemed added to the Lease:

"Section 5(e)    Supplementing the provisions of Paragraph 5(a), for a period of ten (10) years following the Additional Space Commencement Date, Tenant agrees to continuously operate the Additional Space as a multiplex movie theater and for no other purpose so as to maximize the gross receipts which may be produced by such manner of operation."

e.    From and after the Additional Space Commencement Date, the Lease shall be deemed modified, as follows:

(i)    The Demised Premises shall include the Additional Space (the aggregate square footage of the original Demised Premises together with the Additional Space equals 41,345 square feet) for all purposes of the Lease including, but not limited to, the calculation of Tenant's share of Taxes, Common Area Maintenance Charges and Utilities (including, but not limited to, electric charges, water and sewer charges and waste disposal charges); and

(ii)    The basic rent per annum reserved in the Lease shall be increased by TWO HUNDRED FORTY-NINE THOUSAND NINE HUNDRED THIRTY-SEVEN AND 50/100 ($249,937.50) DOLLARS.

(iii)    The basic rent per annum applicable during the extension terms shall be increased as follows with respect to the Additional Space:

(a)    during the first extended term the basic rent per annum shall be increased by $17.50 per square foot (TWO HUNDRED EIGHTY-TWO THOUSAND ONE

HUNDRED EIGHTY-SEVEN AND 50/100
($282,187.50) DOLLARS per annum and TWENTY
THREE THOUSAND FIVE HUNDRED FIFTEEN
AND 63/100 ($23,515.63) DOLLARS per month);

(b)    during the second extended term the basic rent per
annum shall be increased by EIGHTEEN AND 00/100
($18.00) per square foot (TWO HUNDRED NINETY
THOUSAND TWO HUNDRED FIFTY AND 00/100
($290,250.00) DOLLARS per annum and TWENTY-
FOUR THOUSAND ONE HUNDRED EIGHTY-
SEVEN AND 50/100 ($24,187.50) DOLLARS per
month);

(c)    during the third extended term the basic rent per annum
shall be increased by EIGHTEEN AND 50/100 ($18.50)
DOLLARS per square foot (TWO HUNDRED
NINETY-EIGHT THOUSAND THREE HUNDRED
TWELVE AND 50/100 ($298,312.50) DOLLARS per
annum and TWENTY-FOUR THOUSAND EIGHT
HUNDRED FIFTY-NINE AND 38/100 ($24,859.38)
per month); and

(d)    during the fourth extended term the basic rent per annum
shall be increased by NINETEEN AND 00/100 ($19.00)
DOLLARS per square foot (THREE HUNDRED SIX
THOUSAND THREE HUNDRED SEVENTY-FIVE
AND 00/100 ($306,375.00) DOLLARS per annum and
TWENTY-FIVE THOUSAND FIVE HUNDRED
THIRTY-ONE AND 25/100 ($25,531.25) per month).

SECOND:    A.    Tenant agrees, at Tenant's sole cost and expense, to perform and supply

such work, installations, fixtures and equipment as shall be necessary to fully equip and complete the

Demised Premises (including the Additional Space) for the lawful operation of a so-called "multiplex"

movie theater, in accordance with the provisions of the Lease.  The work, installations, fixtures and

equipment required to be performed, made and supplied by Tenant, pursuant to the provisions of this

Article SECOND, are referred to herein as "Tenant's Construction".  All appurtenances, fixtures,

improvements, additions and other property attached to or installed in the Additional Space shall be and

remain the property of Landlord, except that any such fixtures, improvements, additions and other

property including, but not limited to, the theatre seats, screens, wall coverings for the auditoriums, audio equipment, concessions equipment and ticket dispensing equipment installed at the sole expense of Tenant, and which are removable without material damage to the Additional Space shall be and remain the property of Tenant.

        B.     Prior to the commencement of Tenant's Construction, Tenant shall submit to Landlord, for Landlord's approval:  (i) detailed plans and specifications of Tenant's Construction, including mechanical, structural and engineering drawings and further including the size, type, brand and quality of all items thereof as well as site plans, lighting schemes, landscaping plans, utility plans and a detailed construction schedule (said plans, specifications and schedules are referred to herein as "Tenant's Construction Plans"), (ii) an estimate of the total cost of Tenant's Construction prepared by the registered architect or licensed engineer in charge of Tenant's Construction.  Tenant's Construction Plans shall include all proposed site work, curbing, driveways, landscaping, lighting, parking lot restoration and relocation and all other related construction work, and (iii) a construction timeline for Tenant's Construction, which approval shall not be unreasonably withheld.

        C.     Tenant shall submit to Landlord Tenant's Construction Plans within ninety (90) days of the date of this Agreement.  Landlord shall submit its comments, if any, within thirty (30) days of receipt of Tenant's Construction Plans and Tenant shall re-submit Tenant's Construction Plans to Landlord within fifteen (15) days of Tenant's receipt of Landlord's comments, if any.  Landlord's approval of Tenant's Construction Plans shall not be unreasonably withheld, delayed or conditioned provided that such Plans are consistent with the plans and specifications dated March 24, 1997 previously delivered to Landlord.  Landlord and Tenant agree to engage in a good faith effort to resolve any disagreements about Tenant's Constructions Plans.

MBECK/SMCIN/46521  Ver 5               -6-              06/25/97  3:31pm

D.    Following Landlord's approval of Tenant's Construction Plans, Landlord agrees, at Landlord's sole cost and expense, to apply for any required zoning and/or site plan and/or any other governmental approvals (other than Building Permits which shall remain the responsibility of Tenant) if required in connection with Tenant's Construction.  Upon obtaining any such approvals, if required, and the receipt by Landlord of the instruments to be delivered by Tenant to Landlord in accordance with the provisions of subsection F, Landlord shall afford access to the Additional Space to Tenant and its contractors for the purpose of performing Tenant's Construction.  Tenant agrees thereafter to promptly procure all necessary building permits and to forthwith commence Tenant's Construction and with reasonable diligence prosecute same to completion.  Tenant, Tenant's architects and Tenant's engineers and other experts shall have access to the Additional Space from and after the date of this Agreement to perform soil tests and other examinations in order to prepare Tenant's Construction Plans provided (i) such access and examinations shall be performed in a manner so as to minimize interference with the operation of the Shopping Center and the other tenants and occupants therein; (ii) Tenant shall restore the Additional Space to its original condition in the event this Agreement is terminated pursuant to the provisions of Article FOURTH; and (iii) Tenant shall indemnify and save Landlord harmless of and from all loss, cost, liability, damage and expense arising from such access and examinations.

E.    All work and installations performed or made by Tenant pursuant to the provisions of this Article SECOND shall be made and performed in a good and workmanlike manner and in full compliance with the provisions of this Lease and all applicable laws, rules, regulations and orders of any applicable governmental authority.  All materials and equipment installed, incorporated or located in the Demised Premises as a result of Tenant's Construction shall be new and first quality.  No materials or equipment shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement of any kind.  Tenant shall not permit the employment of any contractor, mechanic or laborer

in the Demised Premises, if such employment will interfere or cause any conflict with other contractors, mechanics, or laborers engaged in the construction, maintenance or operation of the Shopping Center. In the event of any interference or conflict, Tenant upon demand of Landlord, shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Shopping Center immediately. Tenant's Construction shall be performed in a manner so as to minimize interference with the operation of the Shopping Center and the other tenants and occupants therein.   Tenant's general contractor and all other contractors, and subcontractors and material dealers to be employed by Tenant in connection with Tenant's Construction shall first be approved by Landlord. Tenant does hereby agree to indemnify and save Landlord harmless of and from all cost, liability and expense, including reasonable counsel fees, connected with, relating to, or arising from Tenant's Construction.

F.      Prior to commencement of Tenant's Construction, Tenant shall submit to Landlord, the following: (i) a duplicate original of (x) the contract between Tenant and Tenant's general contractor, and (y) a duplicate original of all contracts between Tenant and any subcontractor or materialmen which contracts shall set forth the total amount which Tenant has agreed to pay to Tenant's general contractor and any subcontractor or materialmen for performance of Tenant's Construction, (ii) so far as the same may be required from time to time, all permits, approvals and authorizations of all governmental authorities having or claiming jurisdiction, (iii) duplicate original policies of workmen's compensation insurance covering all persons to be employed in connection with Tenant's Construction, including those to be employed by all contractors and subcontractors, and of comprehensive public liability insurance (including property damage coverage) in which Landlord, its agents, and any lessor under any superior lease shall be named as parties insured, which policies shall be issued by companies, and shall be in form and amounts, satisfactory to Landlord and shall be maintained by Tenant until the completion of Tenant's Construction and (iv) completed value extended coverage builder's risk insurance

for the Demised Premises during the period of construction of the Tenant's Construction.

G.   Upon completion of Tenant's Construction, Tenant shall deliver to Landlord the following items:

(i)   a Certificate of Occupancy and all other required government certificates and permits issued by the governmental authority having jurisdiction thereof with respect to such addition all of which are required to permit Tenant to legally occupy the Additional Space for its intended purposes; the Certificate of Occupancy shall provide that the Additional Space has been completed in compliance with all legal requirements; and

(ii)   a complete set of final "as-built" plans and specifications for the addition dated and signed by the contractor.

H.   Tenant covenants to Landlord that as of the time of the occupancy of the Additional Space for the conduct of business (the "Occupancy Date"):

(i)   The Additional Space shall conform to all applicable laws, orders, ordinances, permits, rules, regulations and requirements, and to all covenants, conditions and restrictions affecting or relating to the use or occupancy of the Additional Space;

(ii)   All water, sewer, gas, electric, telephone and drainage facilities and all other utilities required by law or by the normal operation of the Additional Space shall be connected to the Additional Space with valid permits so as to service the Additional Space and permit full compliance with all existing requirements of law and normal usage;

(iii)    Tenant shall have paid all bills and claims in connection with Tenant's Construction. Tenant shall nonetheless have the right to contest such bills and claims, but shall not allow any lien to be foreclosed on the Additional Space, or any part thereof or interest therein with respect to any such bill or claim; and

(iv)    Tenant shall have constructed, at its sole cost and expense and in accordance with Tenant's Construction Plans, all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (including any Tenant's pylon) and related improvements, substantially as shown on Tenant's Construction Plans.

I.    Landlord shall cooperate with Tenant's general contractor, subcontractors and materialmen and Tenant shall cause Tenant's general contractor, subcontractors and materialmen, their agents, employees, subcontractors, laborers and material dealers to cooperate with Landlord, its agents, employees or contractors, to the end that Tenant's Construction shall be completed expeditiously and economically.

J.    (1)    Subject to the provisions and requirements of this Article SECOND, and provided that Tenant is not then in default under any of the terms, covenants or conditions of this Lease on the part of Tenant to be observed or performed, Landlord shall contribute the sum of not more than ONE MILLION THREE HUNDRED SEVENTY THOUSAND SIX HUNDRED TWENTY-FIVE AND 00/100 ($1,370,625.00) DOLLARS (such sum shall be reduced by $85.00 per square foot in the event that the Additional Space contains less than 16,125 square feet) in the aggregate toward the cost and expense actually incurred by Tenant with respect to Tenant's Construction. Landlord's contribution on account of Tenant's Construction is referred to as "Landlord's Work

Contribution". Irrespective of the actual cost and expense of Tenant's Construction, in no event shall Landlord's Work Contribution exceed the aggregate sum of ONE MILLION THREE HUNDRED SEVENTY THOUSAND SIX HUNDRED TWENTY-FIVE AND 00/100 ($1,370,625.00) DOLLARS (as such sum may be reduced by virtue of the terms of the preceding sentence).

(2)     Provided that Tenant is not then in default under any of the terms, covenants or conditions of this Lease on Tenant's part to be observed and performed, Landlord shall distribute Landlord's Work Contribution on account of Tenant's Construction to Tenant (i) upon completion of Tenant's Construction in accordance with Tenant's Construction Plans approved by Landlord and otherwise in accordance with the provisions of this Lease and a certification by Tenant's architect or designer to that effect, (ii) upon presentation of proof in form reasonably satisfactory to Landlord of complete payment by Tenant of the cost and expense of such Tenant's Construction (including receipt of waivers of mechanics liens from all contractors, subcontractors, materialmen and laborers who performed any services or delivered any materials in connection with such Tenant's Construction) and (iii) upon presentation of proof that all consents, approvals or signoffs to be obtained by Tenant as required by any governmental authority.

(3)     The making of the Landlord's Work Contribution by Landlord shall constitute a single nonrecurring obligation on the part of Landlord.  In the event this Lease is renewed or extended for a further term by agreement or operation of law, Landlord's obligation to give Landlord's Work Contribution or any part thereof shall not apply to any such renewal or extension.

(4)     Tenant acknowledges and agrees that Landlord is merely acting on behalf of Tenant in connection with the disbursement of the Landlord's Work Contribution in

accordance with the provisions of this Section J to Tenant for the contractors, suppliers and materialmen employed in connection with Tenant's Construction, and that Landlord shall have no obligation, liability or responsibility to any of the contractors, suppliers or materialmen seeking any of the Landlord's Work Contribution pursuant to any of the aforesaid contracts or agreements with such contractors, suppliers or materialmen or otherwise, provided that Landlord shall be obligated to disburse such Landlord's Work Contribution only as expressly provided by the provisions of this Section J. Nothing contained in this Section J shall relieve Tenant of any obligations or liabilities to such contractors, suppliers or materialmen under such contracts, agreements or otherwise.

(5)   In the event that Landlord shall fail to comply with its obligation to pay all or any portion of Landlord's Work Contribution to Tenant in accordance with the provisions of Paragraph J of this Article SECOND, Tenant shall have the right, after thirty (30) days written notice to Landlord, to offset against rent payable by Tenant under the Lease, such unpaid amount of Landlord's Work Contribution together with interest at prime rate as published in the Wall Street Journal from its due date until the date that such offset is made.

K.   Notwithstanding any other provisions of the Lease to the contrary, Tenant shall, at all times, put, keep and maintain the Additional Space, including, without limitation, the roof, landscaping, walls, footings, HVAC systems, electrical and plumbing systems, foundations and structural components of the Additional Space in good repair and appearance and, in the case of any related equipment, in good mechanical condition, except for ordinary wear and tear, and shall promptly make all repairs and replacements (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen and in compliance with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public

authority affecting the Additional Space, which may be required to be made upon or in connection with the Additional Space in order to keep and maintain the Additional Space in as good repair and appearance as they were originally, except for ordinary wear and tear. Nothing herein shall operate to relieve Landlord from its obligations under the Lease, as hereby amended, for repairs to, and maintenance of, the original Demised Premises (the "Existing Space") except to the extent the same are necessitated by the construction, operation, maintenance, alteration or reconstruction of the Additional Space, including, without limitation, defects in materials or workmanship in the joinder of the roof, walls and foundation and the electrical, plumbing and HVAC systems of the Additional Space to the Existing Space, in which case, and to such extent only, Tenant shall be responsible therefor. Tenant acknowledges that, with respect to the Additional Space, this is an absolute net lease and Landlord shall not be required to make any repair of the Additional Space, whether foreseen or unforeseen, or to maintain the Additional Space in any way. Tenant shall, in all events, make all repairs and replacements for which it is responsible hereunder promptly, and all repairs and replacements shall be in a good, proper and workmanlike manner.

        L.    Tenant, by its signature below, hereby waives its right to cancel the automatic extension of the Lease for the first extension term under Section 2(b) of the Lease and hereby irrevocably commits itself to the extension of the Lease for the first five (5) year extension term.

        M.    Notwithstanding the Additional Space Commencement Date, Landlord agrees that Tenant shall be granted possession of the Additional Space upon execution of this Agreement with all the terms and provisions of this Agreement to apply to such possession; provided, however, that rentals due by Tenant to Landlord with respect to the Additional Space shall not commence until the Additional Space Commencement Date.

THIRD:        Landlord represents and warrants to Tenant that:

(1)     The Additional Space is free from all encumbrances, liens, defects in title, violations of law, leases, tenancies, easements, restrictions and agreements except (i) those as set forth on Exhibit "2" annexed hereto and made a part hereof which shall not materially interfere with Tenant's use and enjoyment of the Additional Space and (ii) any other such matters provided they do not interfere with Tenant's use and enjoyment of the Additional Space;

(2)     That at the time of the commencement of the term applicable to the Additional Space, sole and undisturbed physical possession of the entire Additional Space will be delivered to Tenant free and clear of all liens, defects in title, encumbrances, restrictions, agreements, easements, tenancies and violations of law except (i) as set forth in Exhibit 2 and (ii) any other such matters provided they do not interfere with Tenant's use and enjoyment of the Additional Space;

(3)     At the time of commencement of the term applicable to the Additional Space, the Additional Space shall be zoned so that operation of a multiple-auditorium motion picture theatre in accordance with the plans and specifications therefor as mutually agreed upon by Landlord and Tenant shall be permitted; and;

(4)     Landlord shall maintain in good order and condition, as a part of the common area maintenance, all parking areas, exists, entrances and driveways in the Shopping Center, together with adequate illumination thereof.

FOURTH:        Landlord and Tenant shall each have the right to terminate this Agreement

MBECK/SMCIN/46521  Ver 5                         -14-                         06/25/97  3:31pm

at any time after the date which is three hundred sixty-five (365) days after the date of this Agreement (such date of termination is referred to as the "Earlier Termination Date") by notice to the other exercising such right at least sixty (60) days prior to the Earlier Termination Date in the event that, despite the diligent efforts of Landlord and Tenant, all necessary governmental approvals and Building Permits for Tenant's Construction have not then been issued. Notwithstanding the giving of such notice of termination, Landlord and Tenant shall comply with all of the terms, covenants and conditions of this Agreement for all periods through and including the Earlier Termination Date. In the event that Landlord or Tenant shall give any such notice of termination pursuant to the provisions of this Article FOURTH, this Agreement shall come to an end and expire on the Earlier Termination Date with the same force and effect as though said date were the Expiration Date, unless sooner terminated pursuant to any other term, covenant or condition of this Lease or pursuant to law. However, any such termination of this Agreement shall not (i) negate Tenant's indemnity under Paragraph D of Article SECOND, which provisions shall continue in full force and effect or (ii) affect any obligations of Landlord or Tenant under the Lease, which obligations shall continue in full force and effect.

FIFTH:        Tenant represents and warrants to Landlord and Landlord represents to Tenant that no broker was responsible for bringing about this Agreement and that this Agreement was negotiated directly between Landlord and Tenant.

SIXTH:        Except to the extent expressly modified by the foregoing provisions of this Agreement, the Lease shall continue in full force and effect and from and after the Additional Space Commencement Date, except as provided otherwise herein, all provisions of the Lease shall be deemed applicable to the Additional Space as part of the Demised Premises.

MBECK/SMCIN/46521 Ver 5                    -15-                    06/25/97 3:31pm

IN WITNESS WHEREOF, the parties hereto have here unto set their hands and seals as

of the day and year first above written.

INLET SQUARE PROPERTIES, L.L.C.,
Landlord

BY:   TCW ASSET MANAGEMENT COMPANY,
as Manager

BY: _____
Authorized Signatory

BY: _____
Authorized Signatory

REGAL CINEMAS, INC., Tenant

BY: _____  SR. VP

MBECK/SMCIN/46521  Ver 5            -16-            06/25/97  3:31pm

STATE OF Tennessee )
                                        :ss.:
COUNTY OF Knox          )

On the 30 day of June , 1997, before me personally came R. Keith Thompson

to me known, who, being by me duly sworn, did depose and say that he resides

at Knox County, Tennessee and that he is the Senior Vice Pres of **REGAL CINEMAS, INC.**, the

corporation described in and which executed the foregoing instrument; and that he signed his name

thereto by authority of the Board of Directors of said corporation.


Carol M Hall
Notary Public


STATE OF California )
                                        :ss.:
COUNTY OF Los Angeles )


On 17th July , 1997, before me, Shirley C. Larsen, Notary Public, in and

for said State, personally appeared Russel S. Bernand and Kenneth Leary,

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose

names are subscribed to the within instrument and acknowledged to me that they executed the same in

their authorized capacity, and that by their signatures on the instrument the persons, or the entity upon

behalf of which the persons acted, executed the instrument.


SUBSCRIBED AND SWORN to me this 17th of July , 1997.


Shirley C. Larsen
Notary Public
(Seal of Notary)

SHIRLEY C. LARSEN
Commission #1090314
Notary Public — California
Los Angeles County
My Comm. Expires Mar 14, 2000



EXHIBIT 2

| POLICY NO. | SCHEDULE B |
|---|---|
| 41-345-109-000001 | |

This policy does not insure against loss or damage by reason of the following:

(1) All general or special taxes and assessments, including Public Service District assessments, if any, for Horry County, South Carolina for the year 1996 and subsequent years.

(2) No insurance is afforded as to the exact amount of acreage contained in the property described herein.

(3) Easement granted to the South Carolina Public Service Authority, dated November 14, 1950 and recorded in Deed Book 88 at Page 197, aforesaid records.

(4) Easement granted to the South Carolina Public Service Authority, dated November 7, 1950 and recorded in Deed Book 88 at Page 201, aforesaid records.

(5) Right-of-Way granted to the South Carolina Public Service Authority, dated June 18, 1984 and recorded in Deed Book 898 at Page 178, aforesaid records.

(6) Terms, conditions, and provisions of Sewer Line Easement contained in Reciprocal Easements and Restrictions Agreement, dated May 24, 1984 entered into by and between CBL Management, Inc., a Tennessee Corporation, and Gerald A. Tadlock recorded in Deed Book 871 at Page 174, aforesaid records. This policy affirmatively insures that the restrictive covenants contained in said Agreement do not affect the insured premises.

(7) Easement granted by Charlie Sing to the South Carolina Public Service Authority, dated July 14, 1964 and recorded in Deed Book 309 at Page 378, aforesaid records.

(8) Easement granted by Charlie Sing to the South Carolina Public Service Authority, dated November 1, 1950 and recorded in Deed Book 88 at Page 191 on February 1, 1951, aforesaid records. This policy insures that as of the date hereof, said easement is inactive.

(9) Easement granted by S.T. Jordan to the South Carolina Public Service Authority, dated October 26, 1950 and recorded in Deed Book 88 at Page 193 on February 1, 1951, aforesaid records. This policy insures that as of the date hereof, said easement is inactive.

2

POLICY NO.                                                          SCHEDULE B
41-345-109-000001

(10) Right-of-way granted by Tad's Land Development Company, Inc., and Gerald A. Tadlock as Grantors to the South Carolina Public Service Authority as Grantee, dated December 28, 1988 and recorded in Deed Book 1304 at Page 841 on April 25, 1989, aforesaid records.  This policy insures the right of the insured to drive upon and pave the right-of-way in accordance with the terms and conditions of a letter from the South Carolina Public Service Authority to Coastal Limited Partnership dated April 4, 1990.

(11) Right-of-way granted by Tad's Land Development Company, Inc., and Gerald A. Tadlock as Grantors to the South Carolina Public Service Authority as Grantee, dated December 28, 1988 and recorded in Deed Book 1304 at Page 850, on April 25, 1989, aforesaid records.

(12) Right-of-way granted by Jim T. Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J. Koloditch and Steven T. Jordan as Grantors to the South Carolina Public Service Authority as Grantee, dated December 28, 1988 and recorded in Deed Book 1304, at Page 861 on April 25, 1989, aforesaid records.  This policy insures the right of the insured to drive upon and pave the right-of-way in accordance with terms and conditions of a letter from the South Carolina Public Service Authority to Coastal Limited Partnership dated April 4, 1990.

(13) Right-of-way granted by Jim T. Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J. Koloditch and Steven T. Jordan as Grantors to the South Carolina Service Authority as Grantee, dated December 28, 1988 and recorded in Deed Book 1304, at Page 826, on April 25, 1989, aforesaid records.  This policy insures the right of the insured to drive upon and pave the right-of-way in accordance with the terms and conditions of a letter from the South Carolina Public Service Authority to Coastal Limited Partnership dated April 4, 1990.

(14) Right-of-way granted by Charlie Sing and Charlie James Sing as Grantors to the South Carolina Public Service Authority as Grantee, dated December 22, 1988 and recorded in Deed Book 1304 at Page 834, on April 25, 1989, aforesaid records.

3

POLICY NO.                                                                    SCHEDULE B
41-345-109-000001

(15) Right-of-way granted by Charlie James Sing and Charlie
     Sing as Grantors to the South Carolina Public Service
     Authority as Grantee, dated December 22, 1988 and recorded
     in Deed Book 1304, at Page 855, on April 25, 1989,
     aforesaid records.

(16) Reciprocal Easement Agreement, dated December 15, 1988,
     entered into by and between Coastal Limited Partnership
     and Carolina G.S.M. Associates, L.P. recorded in Deed Book
     1289, at Page 421 on February 27, 1988, aforesaid records.

(17) Right-of-way dated June 28, 1989, from Coastal Limited
     Partnership to Horry Telephone Cooperative, Inc., recorded
     in Deed Book 1326 at Page 573, aforesaid records.

(18) Term's, conditions, and provisions of Lease Agreement made
     and entered into by and between Charlie Sing, Carrie W.
     Sing and  Charlie James Sing as Lessor and Kenneth D.
     Anderson as Lessee recorded in Deed Book 815 at Page 249
     on August 23, 1983, aforesaid records, as assigned by
     Assignment of Lease entered into by and between Kenneth D.
     Anderson as Lessor and Gerald A. Tadlock as Assignee dated
     January 15, 1987, recorded in Deed Book 1109 at Page 738
     on January 16, 1987, aforesaid records, said Lease amended
     by Amendment of Lease Agreement dated September 15, 1987
     and recorded in Deed Book 1173 at Page 341 on October 30,
     1987, aforesaid records, as subleased to Coastal Limited
     Partnership a South Carolina Limited Partnership as
     evidenced by Memorandum of Lease dated January 21, 1988,
     recorded in Deed Book 1193, at Page 250, aforesaid
     records, as amended by First Amended Memorandum of Lease
     dated November 4, 1988, recorded November 18, 1988, in
     Deed Book 1266, at Page 695, aforesaid records, and
     Landlord's  Non-Disturbance Agreement entered into by and
     between Charlie Sing and Charlie James Sing as Fee Owner,
     Gerald A. Tadlock as Groundlessee and Coastal Limited
     Partnership, a South Carolina Limited Partnership, as
     Sublessee, dated September 15, 1987 and recorded in Deed
     Book 1193 at Page 296, on January 21, 1988, aforesaid
     records, as modified by that certain Estoppel,
     Modification of Ground Lease and Clarification of
     Landlord's Non-Disturbance Agreement dated April 27, 1990
     entered into by and between Charlie Sing, Charlie James
     Sing, Gerald A. Tadlock, Tad's Land and Development
     Company, Inc., and Coastal Limited Partnership recorded in
     Deed Book 1393 at Page 528 on May 21, 1990, aforesaid

4

POLICY NO.                                                                    SCHEDULE B
41-345-109-000001

records, as conveyed by Master Deed to Metropolitan Life
Insurance Company recorded August 2, 1993 in Book 1655, at
Page 105, aforesaid records, as assigned to Inlet Square
Properties, L.L.C., by Assignment dated December 22, 1995,
recorded December 28, 1995, in Book 1840, at Page 666,
aforesaid records.

(19) Terms, conditions, and provisions of Lease Agreement made
and entered into by and between Jim T. Jordan, Dorothy
Mason Jordan, Marian J. Thomson, Connie J. Koloditch and
Steven T. Jordan as Lessor and Tad's and Development
Company, Inc., as Lessee, dated January 27, 1983, and
recorded in Deed Book 793 at Page 776, aforesaid records,
as amended by First Amendment to Lease Agreement, dated
July 8, 1987 and recorded in Deed Book 1153 at Page 201 on
August 6, 1987, aforesaid records, as subleased to Coastal
Limited Partnership, a South Carolina Limited Partnership
as evidenced by Memorandum of Lease dated January 21,
1988, recorded in Deed Book 1193, at Page 250, aforesaid
records, as amended by First Amended Memorandum of Lease
dated November 4, 1988, recorded November 18, 1988 in Deed
Book 1266, at Page 695, aforesaid records, and Landlord's
Non-Disturbance Agreement entered into by and between Jim
T. Jordan, et al., as Fee Owner, Tad's Land and
Development Company, Inc. as Groundlessee and Coastal
Limited Partnership, a South Carolina Limited Partnership,
as Sublessee, dated September 18, 1987 and recorded in
Deed Book 1193 at Page 286, on January 21, 1988, aforesaid
records, as modified by that certain Estoppel and
Clarification of Landlord's Non-Disturbance Agreement
dated April 26, 1990 entered into by and between Jim T.
Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J.
Koloditch, Steven T. Jordan, Gerald A. Tadlock, Tad's Land
and Development Company, Inc., and Coastal Limited
Partnership recorded in Deed Book 1393 at Page 512, on
May 21, 1990, aforesaid records, as conveyed by Master
Deed to Metropolitan Life Insurance Company recorded
August 2, 1993 in Book 1655, at Page 105, aforesaid
records, as assigned to Inlet Square Properties, L.L.C.,
by Assignment dated December 22, 1995, recorded December
28, 1995, in Book 1840, at Page 666, aforesaid records.

(20) Agreement between Metropolitan Life Insurance Company and
G. Lance Griffith and Pauline S. Griffith dated October
14, 1994.

5

POLICY NO.
41-345-109-000001

SCHEDULE B

SUBORDINATE MATTERS:

(1)    Owner-Sublessee Agreement, dated April 27, 1989, by and between Tad's Land and Development Company, Inc., Gerald A. Tadlock and J.C. Penney Company, Inc. recorded in Deed Book 1331, at Page 615 on August 14, 1989, aforesaid records.

(2)    Memorandum of Lease entered into by and between Coastal Limited Partnership, a South Carolina Limited Partnership, as Landlord and J.C. Penney Company, Inc., a Delaware Corporation, as Tenant, dated as of May 11, 1989 and recorded in Deed Book 1320 at Page 706, aforesaid records. This Memorandum of Lease restricts the Out Parcels described therein.

(3)    Memorandum of Lease entered into by and between Coastal Limited Partnership, a South Carolina Limited Partnership, as Landlord and Belk's Department Store of Jacksonville, N.C., Inc., a North Carolina Corporation, as Tenant, dated as of May 25, 1989 and recorded in Deed Book 1317, at Page 145 on June 16, 1989, and in Deed Book 1326, at Page 327, aforesaid records.

(4)    Landlord's Non-Disturbance Agreement, entered into by and between Tad's Land and Development Company, Inc., Gerald A. Tadlock, Coastal Limited Partnership and Belk's Department Store of Jacksonville, North Carolina, Inc., dated May 15, 1989 and recorded in Deed Book 1317, at Page 149, on June 16, 1989, aforesaid records.

(5)    Memorandum of Lease, dated June 21, 1989, entered into by and between Coastal Limited Partnership as Landlord and K-Mart Corporation as Tenant, recorded in Deed Book 1329, at Page 355 on August 2, 1989, aforesaid records.

(6)    First Mortgage and Security Agreement granted by Gerald A. Tadlock and Tad's Land and Development Company as Landlord to The National Bank of South Carolina recorded in Mortgage Book 1403, at Page 29, aforesaid records, as modified by Subordination and Consent Agreement granted by The National Bank of South Carolina to Metropolitan Life Insurance Company, dated May 3, 1990 and recorded in Mortgage Book 1523, at Page 80, on May 21, 1990 at 8:35 a.m., aforesaid records.

6

POLICY NO.                                                    SCHEDULE B
41-345-109-000001

(7)  Assignment of Leases, Rents and Profits, dated October
     25,1988, granted by Gerald A. Tadlock and Tad's Land and
     Development Company as Assignor to The National Bank of
     South Carolina as Assignee recorded in Mortgage Book 1403,
     at Page 58, aforesaid records, as modified by
     Subordination and Consent Agreement granted by The
     National Bank of South Carolina to Metropolitan Life
     Insurance Company, dated May 3, 1990 and recorded in
     Mortgage Book 1523 at Page 80, on May 21, 1990 at 8:35
     a.m., aforesaid records.

(8)  Assignment of Lease Proceeds, Rents and Profits dated
     October 25, 1988 granted by Gerald A. Tadlock and Tad's
     Land and Development Company as Assignor to The National
     Bank of South Carolina as Assignee recorded in Deed Book
     1261 at Page 488 and recorded in Mortgage Book 1403 at
     Page 79, aforesaid records, as modified by Subordination
     and Consent Agreement granted by The National Bank of
     South Carolina to Metropolitan Life Insurance Company,
     dated May 3, 1990 and recorded in Mortgage Book 1523 at
     Page 80, on May 21, 1990 at 8:35 a.m., aforesaid records.

(9)  Collateral Assignment of Lease dated October 25, 1988
     granted by Gerald A. Tadlock as Assignor to The National
     Bank of South Carolina as Lender recorded in Deed Book
     1261, at Page 476, aforesaid records, as modified by
     Subordination and Consent Agreement granted by The
     National Bank of South Carolina to Metropolitan Life
     Insurance Company, dated May 3, 1990 and recorded in
     Mortgage Book 1523, at Page 80, on May 21, 1990 at 8:35
     a.m., aforesaid records.

(10) Collateral Assignment of Lease dated October 25, 1988
     granted by Tad's Land and Development Company as Assignor
     to The National Bank of South Carolina as Lender recorded
     in Deed Book 1261 at Page 482, aforesaid records, as
     modified by Subordination and Consent Agreement granted by
     The National Bank of South Carolina to Metropolitan Life
     Insurance Company, dated May 3, 1990 and recorded in
     Mortgage Book 1523, at Page 80, on May 21, 1990 at 8:35
     a.m., aforesaid records.

(11) UCC Financing Statement No. 106541, showing Gerald A.
     Tadlock and Tad's Land and Development Company as Debtor
     and The National Bank of South Carolina as Secured Party,
     filed for record October 27, 1988, as continued by UCC
     Financing Statement No. 2070, filed for record
     September 24, 1993 at 11:30 a.m., aforesaid records.

                              7

POLICY NO.                                                    SCHEDULE B
41-345-109-000001

(12) Mortgage and Security Agreement dated July 28, 1995
     granted by Gerald A. Tadlock and Tad's Land and
     Development Company as Mortgagor to Peoples Federal
     Savings and Loan Association of South Carolina, recorded
     July 31, 1995 in Book 2015, at Page 695, aforesaid
     records.

(13) Assignment of Leases, Rents and Profits dated July 28,
     1995, granted by Gerald A. Tadlock and Tad's Land and
     Development Company, Inc., to Peoples Federal Savings and
     Loan Association of South Carolina, recorded July 31, 1995
     in Book 1812, at Page 1478, aforesaid records.

(14) Assignment of Leases, Rents and Profits dated July 28,
     1995, granted by Gerald A. Tadlock and Tad's Land and
     Development Company, Inc., to Peoples Federal Savings and
     Loan Association of South Carolina, recorded July 31, 1995
     in Book 1812, at Page 1470, aforesaid records.

(15) UCC Financing Statement No. 007668, showing Gerald A.
     Tadlock and Tad's Land and Development Company, Inc., as
     Debtor and Peoples Federal Savings and Loan Association as
     Secured Party, filed for record on July 31, 1995 at 3:00
     p.m.

(16) Memorandum of Lease by Coastal Limited Partnership as
     Landlord and Litchfield Theatres, Ltd., as Tenant dated
     June 19, 1991, recorded June 11, 1993 in Book 1642 at Page
     450, aforesaid records, as modified by Memorandum of Lease
     by and between Metropolitan Life Insurance Company, as
     Landlord and Litchfield Theatres, Ltd. as Tenant and Regal
     Cinemas, Inc., by document dated June 16, 1994, recorded
     September 15, 1994 in Book 1757 at Page 196, aforesaid
     records.

ALL those certain parcels of land lying in Socastee Township, Horry County, South Carolina, and being more fully described as follows:

BEGINNING at a point in the eastern line of U. S. Highway 17 Bypass (along the said eastern line, this point lies the following courses and dimensions from its intersection with the northern or northwestern line of U. S. 17 Business:   north 14 degrees, 00 minutes east, 328.77 feet; south 75 degrees, 59 minutes east, 50.00 feet; north 14 degrees, 01 minutes east, 1623.87 feet; north 76 degrees, 01 minute west, 50.00 feet; north 13 degrees, 58 minutes east, 700.30 feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13 degrees, 58 minutes east, 306.64 feet), said point also being the southwesternmost corner of the property now or formerly of James Marion Collins; run thence south 86 degrees, 03 minutes east, along the southern line of said Collins property, 493.25 feet to a point; thence south 87 degrees, 07 minutes east, continuing along said line of said Collins property, 167.40 feet to a point; thence south 84 degrees, 14 minutes east, continuing along said line of said Collins property, 436.94 feet to a point, said point being the northwesternmost corner of the property now or formerly of Jim T. Jordan; thence south 35 degrees, 01 minute west, along the western line of said Jordan property, 196.50 feet to a point; thence south 58 degrees, 06 minutes east, along the southern line of said Jordan property, 465.40 feet to a point; thence south 33 degrees, 54 minutes west, 9.00 feet to a point; thence south 58 degrees, 06 minutes east, 30.90 feet to a point; thence in a curve to the right having a radius of 101.00 feet, an arc distance of 127.04 feet (said curve being subtended by a chord bearing south 22 degrees, 04 minutes east, 118.83 feet) to a point; thence south 13 degrees, 58 minutes west, 259.32 feet to a point; thence south 41 degrees, 35 minutes east, 44.18 feet to a point; thence south 74 degrees, 38 minutes east, 44.87 feet to a point; thence north 63 degrees, 13 minutes east, 56.54 feet to a point; thence south 18 degrees, 12 minutes west, 130.00 feet to a point; thence north 48 degrees, 44 minutes west, 43.48 feet to a point; thence north 74 degrees, 44 minutes west, 39.48 feet to a point; thence south 70 degrees, 35 minutes west, 43.63 feet to a point; thence south 13 degrees, 58 minutes west, 109.18 feet to a point; thence south 58 degrees, 58 minutes west, 790.82 feet to a point; thence south 19 degrees, 00 minutes east, 13.70 feet to a point, said point being the northeasternmost corner of that property conveyed to Carolina G.S.M. Associates, L.P. by deed of record in Deed Book

EXHIBIT A

CONTINUATION OF DESCRIPTION:

1016, page 415 in the Office of the Clerk of Court, Horry County,
South Carolina; thence south 53 degrees, 31 minutes west, along the
northern line of said Carolina G.S.M. property, 162.00 feet to a
point; thence north 84 degrees, 30 minutes west, continuing along
the northern line of said Carolina G.S.M. property, 240.00 feet to
a point, said point being a point in the northern line of said
Carolina G.S.M. property; thence north 84 degrees, 30 minutes west,
351.74 feet to a point; thence southwestwardly in a curve to the
right having a radius of 2900.79 feet, an arc distance of 224.06
feet (said curve being subtended by a chord bearing south 16
degrees, 23 minutes west, 224.00 feet) to a point; thence south 18
degrees, 36 minutes west, 74.12 feet to a point; thence in a curve
to the left having a radius of 1396.39 feet, an arc distance of
112.82 feet (said curve being subtended by a chord bearing south
16 degrees, 17 minutes west, 112.79 feet) to a point; thence south
13 degrees, 58 minutes west, 26.50 feet to a point in the northern
line of a private road known as Tadlock Drive; thence westwardly
along the northern line of said Tadlock Drive in a curve to the
left having a radius of 994.75 feet, an arc distance of 63.94 feet
(said curve being subtended by a chord bearing north 74 degrees,
21 minutes west, 63.93 feet) to a point; thence north 77 degrees,
23 minutes west, continuing along said line of said Tadlock Drive,
187.76 feet to a point in the eastern line of aforesaid U. S.
Highway 17 Bypass; thence north 14 degrees, 01 minute east, along
the said line of said highway, 510.00 feet to a point; thence south
75 degrees, 59 minutes east, 199.16 feet to a point; thence north
13 degrees, 58 minutes east, 114.48 feet to a point; thence
northwardly in a curve to the left having a radius of 49.00 feet,
an arc distance of 38.48 feet (said curve being subtended by a
chord bearing north 08 degrees, 32 minutes west, 37.50 feet) to a
point; thence north 31 degrees, 02 minutes west, 260.95 feet to a
point in the aforesaid line of Highway 17 Bypass; thence along said
line of said highway the following courses and dimensions:  north
14 degrees, 01 minute east, 122.71 feet; north 76 degrees, 01
minute west, 50.00 feet; north 13 degrees, 58 minutes east, 700.30
feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13
degrees, 58 minutes east, 306.64 feet all to the POINT OF BEGINNING
containing 49.763, more or less, ACRES.

TOGETHER WITH that certain Access Drive Easement and Sewer Line
Easement contained in Reciprocal Easements and Restrictions

EXHIBIT A

CONTINUATION OF DESCRIPTION:

Agreement, dated May 24, 1984, entered into by and between CBL Management, Inc., a Tennessee Corporation, and Gerald A. Tadlock, recorded in the Office of the Clerk of Court for Horry County, South Carolina in Deed Book 871 at Page 174.

TOGETHER WITH that certain Reciprocal Easement Agreement, dated December 15, 1988, entered into by and between Coastal Limited Partnership and Carolina G.S.M. Associates, L.P., recorded in the R. M. C. Office for Horry County, South Carolina in Deed Book 1289 at Page 421 on February 27, 1988.

TOGETHER WITH that certain Easement Agreement dated February 15, 1990 entered into by and between Coastal Limited Partnership, CBL Management, Inc., Tad's Land and Development Company, Inc. and Gerald A. Tadlock, recorded in the R. M. C. Office for Horry County, South Carolina in Deed Book 1377 at Page 842 on March 22, 1990.

**INLET SQUARE PROPERTIES, L.L.C.**
c/o Oaktree Capital Management, LLC
550 South Hope Street, 22nd Floor
Los Angeles, CA  90071
(213) 614-0900

July 28, 1996

**Via Federal Express**

Herbert S. Sanger, Jr.
Wagner, Myers & Sanger
1801 First Tennessee Plaza
Knoxville, TN  37901-1308

      Re:    **Regal Cinemas**
                **Inlet Square Mall ,**
                **Murrells Inlet, South Carolina**

Dear Herbert:

I am pleased to enclose two fully executed Additional Space Agreements for Regal Cinemas.
We are excited to work with Regal on this project and have retained The Butner Architectural
Group to act as our project manager during the construction of the expansion.  Kindly inform the
appropriate people at Regal to direct their correspondence and communication during the
construction phase to:

Yann Cowart
The Butner Architectural Group
300-A Water Street, Suite 200
Montgomery, AL  36104
Phone: (334) 264-8888
Fax: (334) 834-6173

with a copy to:

| | | |
|---|---|---|
| Scott B. Chernoff | | Tina Marshall |
| Inlet Square Properties, L.L.C. | | Aronov Realty Management |
| c/o Oaktree Capital Management, LLC | | 3500 Eastern Boulevard |
| 550 South Hope Street, 22nd Floor | and | Montgomery, AL  36123-5000 |
| Los Angeles, CA  90071 | | Phone: (334) 277-1000 |
| Phone: (213) 694-1516 | | Fax: (334) 272-0747 |
| Fax: (213) 694-1598 | | |

In addition, we are enclosing a copy of Mr. Cowart's letter dated July 25, 1997 which outlines some outstanding matters that need to be resolved prior to our formal approval of the plans and project. I believe these items are currently being addressed and may be resolved by the time you get this letter.

Thank you for your assistance in finalizing this document. We look forward to the completion of this expansion and future business opportunities with Regal Cinemas.

Very truly yours,

Scott B. Chernoff
SBC/ds


Enclosures


cc:     Yann Cowart
        Tina Marshall
        Marc Becker

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE, is made as of the 16th day of June, 1994, by and among (i) **METROPOLITAN LIFE INSURANCE COMPANY**, a *New York* corporation, with an address at Suite 600, 303 Perimeter Center North, Atlanta, Georgia 30346 (the "Landlord"); (ii) **LITCHFIELD THEATRES, LTD.**, a South Carolina corporation with an address of 7132 Commercial Park Drive, Knoxville, Tennessee 37918 (the "Tenant"); and (iii) **REGAL CINEMAS, INC.**, a Tennessee corporation, with an address at 7132 Commercial Park Drive, Knoxville, Tennessee 37918 ("Regal").

### Preliminary Statement

A.   Landlord leases to Tenant and Tenant leases from Landlord certain space containing approximately 25,220 square feet (the "Premises") situated within Inlet Square shopping mall (the "Center") at 10125 Highway 17 Bypass, in Murrells Inlet, Horry County, South Carolina, pursuant to that certain:

•  Lease Agreement dated February 22, 1989 (the "Lease") by and between Coastal Limited Partnership ("Former Landlord") and Tenant; and

•  Memorandum of Lease dated June 19, 1991 (the "First Memorandum"), recorded with the Horry County, South Carolina, RMC, in Deed Book 1642, Page 450, on June 11, 1993.

Hereinafter, the "Lease" refers to the Lease as supplemented by the First Memorandum.  A legal description of the land containing the Premises is set forth in Exhibit A, which is attached hereto and incorporated herein.  The Premises and the Center are shown on the site plan which is attached hereto and incorporated herein as Exhibit B.

B.   Former Landlord held leasehold title to the land containing the Premises pursuant to that certain Ground Lease dated January 21, 1988 ("Ground Lease"); Memorandum of Lease dated January 21, 1988, recorded with Horry County RMC in Deed Book 1193, Page 250 ("GL Memorandum"); First Amended Memorandum of Lease dated November 4, 1988, recorded with Horry County RMC in Deed Book 1266, Page 695 ("GL Amendment"); Landlord's Non-disturbance Agreement dated September 18, 1987, recorded with Horry County RMC in Deed Book 1193, Page 286 ("LN-DA"); Estoppel and Clarification of Landlord's Non-disturbance Agreement dated April 26, 1990, recorded with Horry County RMC in Deed Book 1393, Page 512 ("Clarification"); and Estoppel, Modification of Ground Lease and

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE, is made as of the 16th day of June, 1994, by and among (i) METROPOLITAN LIFE INSURANCE COMPANY, a _New York_ corporation, with an address at Suite 600, 303 Perimeter Center North, Atlanta, Georgia 30346 (the "Landlord"); (ii) LITCHFIELD THEATRES, LTD., a South Carolina corporation with an address of 7132 Commercial Park Drive, Knoxville, Tennessee 37918 (the "Tenant"); and (iii) REGAL CINEMAS, INC., a Tennessee corporation, with an address at 7132 Commercial Park Drive, Knoxville, Tennessee 37918 ("Regal").

### Preliminary Statement

A.    Landlord leases to Tenant and Tenant leases from Landlord certain space containing approximately 25,220 square feet (the "Premises") situated within Inlet Square shopping mall (the "Center") at 10125 Highway 17 Bypass, in Murrells Inlet, Horry County, South Carolina, pursuant to that certain:

• Lease Agreement dated February 22, 1989 (the "Lease") by and between Coastal Limited Partnership ("Former Landlord") and Tenant; and

• Memorandum of Lease dated June 19, 1991 (the "First Memorandum"), recorded with the Horry County, South Carolina, RMC, in Deed Book 1642, Page 450, on June 11, 1993.

Hereinafter, the "Lease" refers to the Lease as supplemented by the First Memorandum. A legal description of the land containing the Premises is set forth in Exhibit A, which is attached hereto and incorporated herein. The Premises and the Center are shown on the site plan which is attached hereto and incorporated herein as Exhibit B.

B.    Former Landlord held leasehold title to the land containing the Premises pursuant to that certain Ground Lease dated January 21, 1988 ("Ground Lease"); Memorandum of Lease dated January 21, 1988, recorded with Horry County RMC in Deed Book 1193, Page 250 ("GL Memorandum"); First Amended Memorandum of Lease dated November 4, 1988, recorded with Horry County RMC in Deed Book 1266, Page 695 ("GL Amendment"); Landlord's Non-disturbance Agreement dated September 18, 1987, recorded with Horry County RMC in Deed Book 1193, Page 286 ("LN-DA"); Estoppel and Clarification of Landlord's Non-disturbance Agreement dated April 26, 1990, recorded with Horry County RMC in Deed Book 1393, Page 512 ("Clarification"); and Estoppel, Modification of Ground Lease and

Clarification of Landlord's Non-disturbance Agreement dated April 27, 1990, recorded with Horry County RMC in Deed Book 1393, Page 528 ("Modification").

C.   All of Former Landlord's right, title and interest in the land containing the Premises and in the Ground Lease, GL Memorandum, GL Amendment, LN-DA, Clarification, Modification and Lease were conveyed to Landlord pursuant to that certain Master's Deed dated August 2, 1993, recorded with Horry County RMC in Deed Book 1655, Page 105 ("Master's Deed").

D.   On June 15, 1994, Tenant merged with Regal Acquisition Corporation, a South Carolina corporation, which was wholly owned by Regal, and Tenant, as the surviving corporation, is wholly owned by Regal.  Tenant may at a presently undetermined time be merged into Regal with Regal to be the surviving corporation.

E.   Landlord, Tenant and Regal hereby execute this Memorandum of Lease for the purpose of memorializing the lease of the Premises from Landlord to Tenant pursuant to the terms of the Lease, and also wish to have this Memorandum of Lease recorded in order to give constructive notice of Tenant's leasehold interest in the Premises created pursuant to the Lease.

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants set forth in the Lease, and for other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, Landlord, Tenant and Regal agree as follows:

1.   Lease of the Premises.  Landlord leases to Tenant, and Tenant leases from Landlord, the Premises for the term set forth in Section 2 hereof at the rental and upon the covenants and conditions as set forth in the Lease, which Lease is by this reference incorporated herein and made a part hereof as fully as if set forth herein at length.

2.   Term of Lease.  The initial twenty (20) year term of the Lease began on March 14, 1990, and will end on March 31, 2010, and the tenant has four (4) options to extend the term for periods of five (5) years each.

3.   Subject to Lease.  The lease of the Premises from the Landlord to the Tenant is subject to all the terms, covenants and conditions set forth in the Lease.

4.   Tradename.  Landlord agrees that Tenant (or Regal) may conduct business in the Premises under the trade name of Regal Cinemas.

-2-

5. <u>Regal as Tenant</u>.  Upon any merger of Tenant into Regal with Regal as the surviving corporation, Regal will be the tenant under the Lease.

**IN WITNESS WHEREOF**, Landlord, Tenant and Regal have executed this Memorandum of Lease as of the date first above written.

Landlord:

METROPOLITAN LIFE INSURANCE COMPANY
a _New York_ corporation

Signed, sealed and delivered
in the presence of:

(1) _Gerald D. Cicila_

(2) _Kathleen D. Frady_

By: _Peter W. Turney_
    (PETER W. TURNEY)

Its:  **VICE PRESIDENT**

Attest:

_Nancy J. Hammer_
(ASSISTANT SECRETARY)

[CORPORATE SEAL]

Tenant:

LITCHFIELD THEATRES, LTD.
a South Carolina corporation

Signed, sealed and delivered
in the presence of:

(1) _____

(2) _____

By: _Michael L. Campbell_
    (Michael L. Campbell)

Its: President

Attest:

_R. Keith Thompson_
(R. Keith Thompson,
Assistant Secretary)

[CORPORATE SEAL]

-3-

<u>Regal</u>:

**REGAL CINEMAS, INC.**
**a Tennessee corporation**

Signed, sealed and delivered
in the presence of:

(1) _____    By: _____

(2) _____         (Michael L. Campbell)

Attest:                          Its: President

_____
(R. Keith Thompson,
Assistant Secretary)

[CORPORATE SEAL]

This instrument prepared by
and after recording return to:

Herbert S. Sanger, Jr.
Wagner, Myers & Sanger, P.C.
1801 Plaza Tower
Knoxville, Tennessee  37929
(615) 525-4600

ccb\2707\070\metropol.mem

-4-

STATE OF _____ )
                   )                    PROBATE:
COUNTY OF _____ )

   Personally appeared before me the undersigned witness and made oath that (s)he saw the corporate seal of the within named corporation, METROPOLITAN LIFE INSURANCE COMPANY, a _____ corporation, affixed to the foregoing instrument; that (s)he saw _____ of said METROPOLITAN LIFE INSURANCE COMPANY, METROPOLITAN LIFE INSURANCE COMPANY's duly authorized officer, sign and deliver the same, as (her) his free act and deed and as the free act and deed of said METROPOLITAN LIFE INSURANCE COMPANY; that (s)he saw _____, _____ of said METROPOLITAN LIFE INSURANCE COMPANY, METROPOLITAN LIFE INSURANCE COMPANY's duly authorized officer, attest the same; and that (s)he with _____ witnessed the execution and delivery thereof as the free act and deed of the said METROPOLITAN LIFE INSURANCE COMPANY.

   Witness:  _Kathleen D Grady_____
             (Signature of Witness)


SWORN TO BEFORE ME this ___ day of _____, 1994.

   _____
Notary Public for _____ County, _____ .

My commission expires: _____ .

[NOTARY SEAL]


-5-

STATE OF TENNESSEE )
                   )
                   )      PROBATE:
COUNTY OF KNOX     )

        Personally appeared before me the undersigned witness and made
oath that (s)he saw the corporate seal of the within named
corporation, REGAL CINEMAS, INC., a Tennessee corporation, affixed
to the foregoing instrument; that (s)he saw Michael L. Campbell,
President of said REGAL CINEMAS, INC., REGAL CINEMAS, INC.'s duly
authorized officer, sign and deliver the same, as his free act and
deed and as the free act and deed of said REGAL CINEMAS, INC.; that
(s)he saw R. Keith Thompson, Vice President and Assistant Secretary
of said REGAL CINEMAS, INC., REGAL CINEMAS, INC.'s duly authorized
officer, attest the same; and that (s)he with Gregory W. Dunn
witnessed the execution and delivery thereof as the free act and
deed of the said REGAL CINEMAS, INC.

        Witness: _____
                    (Signature of Witness)

SWORN TO BEFORE ME this 9th day of September , 1994.

_____
Notary Public for Knox County, Tennessee.

My commission expires: _____.

[NOTARY SEAL]

ccb\27071\070\metropol.mem

-7-

EXHIBIT "A"

Legal Description

All that certain parcel of land lying in Socastee Township, Horry County, South Carolina, and being more fully described as follows:

BEGINNING at a point in the eastern line of U. S. Highway 17 Bypass lying the said eastern line this point ties the following courses and dimensions from its intersection with the northern or northwestern line of U. S. 17 Business: north 14 degrees, 00 minutes east, 336.77 feet; south 73 degrees, 36 minutes east, 80.00 feet; north 16 degrees, 01 minutes east, 1833.67 feet; north 91 degrees, 01 minute west, 50.00 feet; north 13 degrees, 34 minutes east, 780.30 feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13 degrees, 36 minutes east, 306.64 feet, said point also being the southwesternmost corner of the property now or formerly of James Derinn Collins; run thence south 06 degrees, 83 minutes east, along the southern line of said Collins property, 493.39 feet to a point; thence south 67 degrees, 87 minutes east, continuing along said line of said Collins property, 167.40 feet to a point; thence south 84 degrees, 10 minutes east, continuing along said line of said Collins property, 436.04 feet to a point, the northwesternmost corner of the property now or formerly of Jan T. Jordan; run thence south 36 degrees, 81 minute west, along the western line of said Jordan property, 194.30 feet to a point; thence south 58 degrees, 86 minutes east, along the southern line of the said Jordan property, 465.40 feet to a point; thence south 33 degrees, 34 minutes west, 7.00 feet to a point; thence north 86 degrees, 00 minutes east, 30.00 feet to a point; thence in a curve to the right having a radius of 101.00 feet, an arc distance of 137.34 feet (said curve being subtended by a chord bearing south 32 degrees, 30 minutes east, 113.03 feet) to a point; thence south 41 degrees, 66 minutes west, 356.32 feet to a point; thence south 13 minutes east, 44.37 feet to a point; thence south 63 degrees, 33 minutes east, 56.94 feet to a point; thence south 10 degrees, 12 minutes west, 130.00 feet to a point; thence north 48 degrees, 44 minutes west, 43.46 feet to a point; thence north 70 degrees, 02 minutes west, 34.46 feet to a point; thence south 70 degrees, 35 minutes west, 42.53 feet to a point; thence south 13 degrees, 55 minutes west, 109.14 feet to a point; thence south 58 degrees, 34 minutes west, 790.83 feet to a point; thence south 18 degrees, 00 minutes east, 12.70 feet to a point, said point being the northeasternmost corner of that property conveyed to Carolina C.S.H. Association, L.P. by deed of record in Deed Book 1216, page 615 in the Office of Clerk of Court, Horry County, South Carolina; thence south 83 degrees, 34 minutes west, along the northern line of said Carolina C.S.H. property, 163.00 feet to a point; thence north 84 degrees, 30 minutes west, continuing along the northern line of said Carolina C.S.H. property, 340.00 feet to a point, said point being a point in the northern line of said Carolina C.S.H. property; thence north 84 degrees, 30 minutes west, 291.74 feet to a point; thence southwestwardly in a curve to the right having a radius of 2466.79 feet, an arc distance of 830.96 feet (said curve being subtended by a chord bearing south 16 degrees, 33 minutes west, 224.00 feet) to a point; thence south 02 degrees, 34 minutes west, 74.12 feet to a point; thence in a curve to the left having a radius of 1296.39 feet, an arc distance of 113.02 feet (said curve being subtended by a chord bearing south 16 degrees, 17 minutes west, 113.75 feet) to a point; thence south 13 degrees, 56 minutes west, 36.00 feet to a point in the northern line of a private road known as Tedleck Drive; thence westwardly along the northern line of said Tedleck Drive in a curve to the left having a radius of 994.75 feet, an arc distance of 63.64 feet (said curve being subtended by north 70 degrees, 21 minutes west, 63.63 feet) to a point; thence north 77 degrees, 33 minutes west, continuing along said line of said Tedleck Drive, 167.76 feet to a point in the eastern line of aforesaid U.S. Highway 17 Bypass; thence north 16 degrees, 01 minute east, along the said line of said highway, 310.60 feet to a point; thence south 73 degrees, 39 minutes east, 149.16 feet to a point; thence north 13 degrees, 34 minutes east, 116.06 feet to a point; thence northwardly in a curve to the left having a radius of 65.00 feet, an arc distance of 36.46 feet (said curve being subtended by a chord bearing north 08 degrees, 33 minutes west, 37.30 feet) to a point; thence north 31 degrees, 33 minutes east, 260.62 feet to a point in the aforesaid line of Highway 17 Bypass; thence along said line of said highway the following courses and dimensions: north 14 degrees, 01 minute east, 133.71 feet; north 73 degrees, 51 minute west, 50.00 feet; north 13 degrees, 33 minutes east, 780.30 feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13 degrees, 34 minutes east, 306.64 feet all to the point of BEGINNING containing 49.763, more or less.

TOGETHER WITH that certain Access Drive Easement and Sewer Line Easement contained in the Reciprocal Easements and Restrictions Agreement dated May 24, 1994, entered into by and between CBL Management, Inc., a Tennessee Corporation, and Gerald A. Tadlock, recorded in the Office of the Clerk of Court for Horry County, South Carolina in Deed Book 871, at page 174.

TOGETHER WITH that certain Reciprocal Easement Agreement dated December 15, 1988, entered into by and between Coastal Limited Partnership and Carolina C.S.H. Associates, L.P., recorded in the R.M.C. Office for Horry County, South Carolina in Deed Book 1269, at page 431 on February 27, 1988.

TOGETHER WITH that certain Easement Agreement dated February 15, 1990, entered into by and between Coastal Limited Partnership, CBL Management, Inc., Tad's Land and Development Company, Inc. and Gerald A. Tadlock, recorded in the R.M.C. Office for Horry County, South Carolina in Deed Book 1171, at page 942 on March 22, 1990.

PAGE 4 OF 71 PAGES

The property described in Exhibit "A" above is the property leased to Coastal Limited Partnership by Tad's Land and Development Company and Gerald A. Tadlock by Ground Lease dated January 21, 1988, a Memorandum of which is recorded in Deed Book 1172, Page 250 in the Office of the Clerk of Court of Horry County, South Carolina, as amended by First Amended Memorandum of Lease dated November 4, 1988, recorded in Deed Book 1266, Page 695 in said Clerk's office.

3

BOOK 1842 PAGE 452

452



INLET SQUARE
MURRELLS INLET, SOUTH CAROLINA

CBL & ASSOCIATES
CHATTANOOGA, TENNESSEE

LEASE EXHIBIT "A"

SHEET 2 OF 2

29-A

STATE OF TENNESSEE )
                   )     PROBATE:
COUNTY OF KNOX     )

    Personally appeared before me the undersigned witness and made oath that (s)he saw the corporate seal of the within named corporation, LITCHFIELD THEATRES, LTD., a South Carolina corporation, affixed to the foregoing instrument; that (s)he saw Michael L. Campbell, President of said LITCHFIELD THEATRES, LTD., LITCHFIELD THEATRES, LTD.'s duly authorized officer, sign and deliver the same, as his free act and deed and as the free act and deed of said LITCHFIELD THEATRES, LTD.; that (s)he saw R. Keith Thompson, Vice President and Assistant Secretary of said LITCHFIELD THEATRES, LTD., LITCHFIELD THEATRES, LTD.'s duly authorized officer, attest the same; and that (s)he with Gregory W. Dunn witnessed the execution and delivery thereof as the free act and deed of the said LITCHFIELD THEATRES, LTD.

Witness: _____
              (Signature of Witness)

SWORN TO BEFORE ME this 9th day of September , 1994.

_____
Notary Public for Knox County, Tennessee.

My commission expires: _7/27/98_____.

[NOTARY SEAL]

-6-

Exhibit B

Page 2 of 2



29

## MEMORANDUM OF LEASE

THIS AGREEMENT made as of the 19th day of _June_____, 1991, by and between **COASTAL LIMITED PARTNERSHIP**, a South Carolina limited partnership, by CBL Management, Inc., General Partner, whose address is 6148 Lee Highway, Chattanooga, Tennessee 37421 (hereinafter referred to as the "Landlord") and **LITCHFIELD THEATRES, LTD.**, whose address is a Post Office Drawer 2189, Pawleys Island, South Carolina 29585 (hereinafter referred to as the "Tenant").

### WITNESSETH:

That the Landlord, in consideration of the rents reserved that are referred to in the collateral lease agreement dated February 22, 1989 and of the terms, covenants, conditions and agreements on the part of the Tenant that are mentioned, demises and leases to the Tenant, and the Tenant takes and hires from the Landlord, certain premises (the "Demised Premises") in Landlord's shopping center, known as Inlet Square located in the City or Township of Murrells Inlet, County of Horry, State of South Carolina and more particularly described in Exhibit "A" attached hereto, said Demised Premises containing approximately 25,220 square feet, and being more particularly described in the collateral lease agreement hereinbefore mentioned.

To have and to hold the Demised Premises for an original term of Twenty (20) years commencing on March 14, 1990 and expiring on March 31, 2010 with options to extend the term for four (4) additional periods of five (5) years each, upon the rents, terms, covenants and conditions contained in a certain Lease Agreement between the parties dated February 22, 1989.

WITNESSES:

LANDLORD:

**COASTAL LIMITED PARTNERSHIP**, a South Carolina limited partnership, by **CBL Management, Inc.**

By: _____
Vice President

ATTEST: _____
Assistant Secretary

TENANT:

**LITCHFIELD THEATRES, LTD.**

WITNESSES:

By: _____
Vice President

ATTEST: _____
Assistant Secretary

1

STATE OF TENNESSEE

COUNTY OF HAMILTON

Personally appeared before me _Karen R. Benson_, who on oath says that she saw the within named **CBL Management, Inc.**, as General Partner of **Coastal Limited Partnership**, by _John D. Jay_, its Vice President and _Joen C. Perry_, its Assistant Secretary, sign the within instrument, and the said corporation, by said officers, seal said instrument, and as the act and deed of said partnership deliver the same, and she with _Grace K. Finnigan_ witnessed the execution thereof.

_Karen R. Benson_
First Witness

SWORN to and subscribed
before me this 16th day
of July, 1991.

_Tina M. Grant_
Notary Public

My Commission expires:

_10-18-94_

STATE OF SOUTH CAROLINA

COUNTY OF GEORGETOWN

Personally appeared before me **Emma Hall-Chidley**, who on oath says that she saw the within named **Litchfield Theatres, Ltd.**, a South Carolina corporation, by **Douglas D. Richardson**, its President and **Kenneth J. Martin**, its Secretary, sign the within instrument, and the said corporation, by said officers, seal said instrument, and as the act and deed of said partnership deliver the same, and she with **Sarah T. Lackey** witnessed the execution thereof.

_Emma Hall-Chidley_
First Witness

SWORN to and subscribed
before me this 10 day
of July, 1991.

_Nancy Ann B Ward_
Notary Public

My Commission expires:

9/24/97

2

EXHIBIT "A"

## Legal Description

All that certain parcel of land lying in Socastee Township, Horry County, South Carolina, and being more fully described as follows:

BEGINNING at a point in the eastern line of U. S. Highway 17 Bypass (along the said eastern line this point lies the following courses and dimensions from its intersection with the northern or northwestern line of U. S. 17 Business: north 14 degrees, 00 minutes east, 328.77 feet; south 75 degrees, 59 minutes east, 50.00 feet; north 14 degrees, 01 minutes east, 1623.87 feet; north 76 degrees, 01 minute west, 50.00 feet; north 13 degrees, 58 minutes east, 700.30 feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13 degrees, 58 minutes east, 306.64 feet, said point also being the southwesternmost corner of the property now or formerly of James Marion Collins; run thence south 86 degrees, 03 minutes east, along the southern line of said Collins property, 493.25 feet to a point; thence south 87 degrees, 07 minutes east, continuing along said line of said Collins property, 167.40 feet to a point; thence south 84 degrees, 14 minutes east, continuing along said line of said Collins property, 436.94 feet to a point, said point being the northwesternmost corner of the property now or formerly of Jim T. Jordan; thence south 35 degrees, 01 minute west, along the western line of said Jordan property, 196.50 feet to a point; thence south 58 degrees, 06 minutes east, along the southern line of the said Jordan property, 465.40 feet to a point; thence south 33 degrees, 54 minutes west, 9.00 feet to a point; thence south 58 degrees, 06 minutes east, 30.90 feet to a point; thence in a curve to the right having a radius of 101.00 feet, an arc distance of 127.04 feet (said curve being subtended by a chord bearing south 22 degrees, 04 minutes east, 118.83 feet) to a point; thence south 13 degrees, 58 minutes west, 259.32 feet to a point; thence south 41 degrees, 35 minutes east, 44.18 feet to a point; thence south 74 degrees, 38 minutes east, 44.87 feet to a point; thence north 63 degrees, 13 minutes east, 56.54 feet to a point; thence south 18 degrees, 12 minutes east, 130.00 feet to a point; thence north 48 degrees, 44 minutes west, 43.48 feet to a point; thence north 74 degrees, 44 minutes west, 39.48 feet to a point; thence south 70 degrees, 35 minutes west, 43.63 feet to a point; thence south 13 degrees, 58 minutes west, 109.18 feet to a point; thence south 58 degrees, 58 minutes west, 790.82 feet to a point; thence south 19 degrees, 00 minutes east, 13.70 feet to a point, said point being the northeasternmost corner of that property conveyed to Caroline G.S.M. Associates, L.P. by deed of record in Deed Book 1016, page 415 in the Office of Clerk of Court, Horry County, South Carolina; thence south 53 degrees, 31 minutes west, along the northern line of said Caroline G.S.M. property, 162.00 feet to a point; thence north 84 degrees, 30 minutes west, continuing along the northern line of said Caroline G.S.M. property, 240.00 feet to a point, said point being a point in the northern line of said Caroline G.S.M. property; thence north 84 degrees, 30 minutes west, 351.74 feet to a point; thence southwestwardly in a curve to the right having a radius of 2900.79 feet, an arc distance of 224.06 feet (said curve being subtended by a chord bearing south 16 degrees, 23 minutes west, 224.00 feet) to a point; thence south 18 degrees, 36 minutes west, 74.12 feet to a point; thence in a curve to the left having a radius of 1396.39 feet, an arc distance of 112.82 feet (said curve being subtended by a chord bearing south 16 degrees, 17 minutes west, 112.79 feet) to a point; thence south 13 degrees, 58 minutes west, 26.50 feet to a point in the northern line of a private road known as Tedlock Drive; thence westwardly along the northern line of said Tedlock Drive in a curve to the left having a radius of 74.75 feet, an arc distance of 63.94 feet (said curve being subtended by a chord bearing north 74 degrees, 21 minutes west, 63.93 feet) to a point; thence north 77 degrees, 23 minutes west, continuing along said line of said Tedlock Drive, 187.76 feet to a point in the eastern line of aforesaid U.S. Highway 17 Bypass; thence north 14 degrees, 01 minute east, along the said line of said highway, 510.00 feet to a point; thence south 75 degrees, 59 minutes east, 199.16 feet to a point; thence north 13 degrees, 58 minutes east, 114.48 feet to a point; thence northwardly in a curve to the left having a radius of 49.00 feet, an arc distance of 38.48 feet (said curve being subtended by a chord bearing north 08 degrees, 32 minutes west, 37.50 feet) to a point; thence north 31 degrees, 02 minutes west, 260.95 feet to a point in the aforesaid line of Highway 17 Bypass; thence along said line of said highway the following courses and dimensions: north 14 degrees, 01 minute east, 122.71 feet; north 76 degrees, 01 minute west, 50.00 feet; north 13 degrees, 58 minutes east, 700.30 feet; south 75 degrees, 51 minutes east, 10.00 feet; north 13 degrees, 58 minutes east, 306.64 feet all to the point of BEGINNING containing 49.763, more or less, acres.

TOGETHER WITH that certain Access Drive Easement and Sewer Line Easement contained in the Reciprocal Easements and Restrictions Agreement dated May 24, 1984, entered into by and between CBL Management, Inc., a Tennessee Corporation, and Gerald A. Tadlock, recorded in the Office of the Clerk of Court for Horry County, South Carolina in Deed Book 871, at page 174.

TOGETHER WITH that certain Reciprocal Easement Agreement dated December 15, 1988, entered into by and between Coastal Limited Partnership and Carolina G.S.M. Associates, L.P., recorded in the R.M.C. Office for Horry County, South Carolina in Deed Book 1289, at page 421 on February 27, 1988.

TOGETHER WITH that certain Easement Agreement dated February 15, 1990, entered into by and between Coastal Limited Partnership, CBL Management, Inc., Tad's Land and Development Company, Inc. and Gerald A. Tadlock, recorded in the R.M.C. Office for Horry County, South Carolina in Deed Book 1377, at page 842 on March 22, 1990.

PAGE 1 OF 1 PAGE

The property described in Exhibit "A" above is the property leased to Coastal Limited Partnership by Tad's Land and Development Company, Inc. and Gerald A. Tadlock by Ground Lease dated January 21, 1988, a Memorandum of which is recorded in Deed Book 1193, Page 250 in the Office of the Clerk of Court of Horry County, South Carolina, as amended by First Amended Memorandum of Lease dated November 4, 1988, recorded in Deed Book 1266, Page 695 in said Clerk's office.

## LEASE AGREEMENT

THIS INDENTURE OF LEASE dated the 22nd day of February, 19 89, by and between COASTAL LIMITED PARTNERSHIP, a South Carolina limited partnership, by CBL Management, Inc., General Partner, whose address is 6148 Lee Highway One Park Place, Chattanooga, Tennessee 37421 (hereinafter referred to as "Landlord") and LITCHFIELD THEATRES, LTD., whose address is Post Office Drawer 100, Easley, South Carolina 29641-0100 (hereinafter referred to as "Tenant").

In consideration of Ten and No/100 ($10.00) Dollars, other good and valuable consideration, and the mutual covenants contained herein, and intending to be legally bound hereby, Landlord and Tenant hereby agree with each other as follows:

SECTION 1.  **Premises:**  (a)  Landlord hereby leases and lets to Tenant, and Tenant hereby takes and hires from Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, all that certain tract, piece or parcel of land, in the County of Horry, State of South Carolina, and being located in the City of Murrells Inlet as more particularly described on Exhibit "A", annexed hereto and made a part hereof, (hereinafter sometimes referred to as the "Demised Premises" or the "premises") which Demised Premises form a part of Landlord's shopping center known as Inlet Square (hereinafter referred to as "Shopping Center".)

(b)  The Demised Premises shall extend to the exterior faces of exterior walls or to the building line where there is no wall, or the center line of those walls separating said premises from other leased premises in the Shopping Center, but reserving and excepting to Landlord or its designee the right to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines and wires through hung ceiling space, column space, and partitions, in or beneath the floor slab or above or below the Demised Premises or other parts of the Shopping Center, except that Landlord shall not unreasonably interfere with or. interrupt the business operations of Tenant within the Demised Premises, and except where necessary as determined by Landlord's architect, no pipes, conduits, utility lines or wires installed by Landlord shall be exposed in the sales area of the Demised Premises.

SECTION 2.  **Term:**  (a)  The term of this lease shall commence on the earlier of either (1) the date which is two hundred thirty-five (235) days following the later of (i) Landlord's tender of possession of the Demised Premises or (ii) issuance of a building permit to Tenant, or (2) the date on which Tenant opens for business in the Demised Premises (hereinafter referred to as the "Commencement Date").  Promptly after the Commencement Date, Landlord and Tenant will execute an agreement in recordable form, hereinafter referred to as the "Commencement and Termination Date Agreement" stating, inter alia, the commencement and termination dates of the term of this lease.  If the term commences on a day other than the first day of the month, then the term shall be extended for such fractional month. Notwithstanding the foregoing, the parties agree that in no event shall Tenant be obligated to initially open the Demised Premises for business during the month of September.  Unless Tenant elects to open for business prior thereto, the Commencement Date shall be delayed until the first day following the end of the non-opening period.

(b)  The initial term of this lease shall be for the period of twenty (20) years beginning on the Commencement Date, unless sooner terminated or extended as herein provided.  The term of this lease shall thereafter be extended automatically for up to four (4) additional periods of five (5) years each; at the rent and upon all of the other terms, conditions, covenants and provisions set forth herein; provided, however, that Tenant may cancel this lease, effective as of the date of the expiration of the initial term or any

1

one of the first three extension periods by giving Landlord written notice of such cancellation on or prior to a date one hundred eighty (180) days before the effective date of such cancellation.   Such extension shall be automatic without the necessity of any new lease or other instruments or agreements or any notice being executed or given.   Notwithstanding the aforesaid right of cancellation granted to Tenant hereunder, Tenant may, at any time during the initial term of this lease give Landlord written notice that Tenant elects to waive its option to cancel this lease at the end of the initial term (in which event this lease will thereupon be extended through the next extended period only) and Tenant shall thereafter be unable to exercise its right of cancellation with reference to the extended period referred to in the notice provided for herein.   Hereinafter, all reference to the term of this lease shall be deemed to be a reference as well to such additional periods of time for which the term shall be so extended.

(c)   Notwithstanding the Commencement Date of the term hereof, Landlord agrees that Tenant shall have the possession of the Demised Premises upon execution of this lease with all the terms and provisions of this lease to apply to such possession; provided, however, that rentals due by Tenant to Landlord shall not commence until as provided in Section 3 hereof.

SECTION 3.   Rent:   Upon the Commencement Date of the term hereof, Tenant covenants and agrees to pay Landlord for the Demised Premises basic rent per annum for each year during the term of this lease (if the term commences on a date other than the first day of a month, Tenant shall pay Landlord on the first day of the term, a pro-rata portion of the basic rent per annum, calculated on a thirty (30) day calendar month) equal to the greater of:

(a)(i)   $7.00 during lease years one through four (ii) $9.00 during lease years five through sixteen and (iii) $11.00 during lease years seventeen through twenty for each square foot of "gross area" within the theater to be constructed upon the Demised Premises that Tenant shall be entitled to receive a Building Allowance for pursuant to Section 7 hereof; or

(b)   Eight (8%) per cent of Tenant's gross receipts from gross sales (exclusive of sales and seat taxes) of movie theater tickets, concessions and commissions received from video machines during such lease year.

Gross receipts as used in subsection (b) hereof shall include all lump sum payments received by Tenant under "four wall" agreements whereby the theater is leased by Tenant to an unrelated distributor or group for exhibition of a motion picture, but shall not include those monies to which such exhibitor or group is entitled to receive from admissions to such motion picture.  However, for purposes of computing such gross receipts, such "four wall" agreements shall be limited to a total of not more than twenty (20) days per lease year, per screen.

Provided, further however, that the basic minimum rental per annum due pursuant to subsection (a) above applicable to the initial twenty (20) year term of this lease shall be increased to (i) $11.50 per square foot for each year during the first extended term, (ii) $12.00 per square foot for each year during the second extended term, (iii) $12.50 per square foot for each year during the third extended term and (iv) $13.00 per square foot for each year during the fourth extended term.

All minimum basic rent per annum due pursuant to subsection 3(a)(i) above shall be payable by Tenant in successive equal monthly installments, in advance, on the first day of each and every calendar month during the term of this lease and each extension or renewal term thereof, and shall be payable at the office or residence of the Landlord first above set forth or at such other place of which

2

during which Tenant's business

Landlord shall have given Tenant written notice at least thirty (30) days in advance.

Any additional basic rent per annum due pursuant to subsection (b) above, shall be calculated and payable by Tenant within sixty (60) days after the expiration of each lease year and shall be accompanied by Tenant's computation of its gross receipts from such sales (itemizing the source of such receipt and the amount from each source). Tenant shall keep a full and accurate set of books adequately showing the amount of such gross receipts and Landlord, during the term hereof, shall have the right to inspect Tenant's books, records and other data pertaining to such gross receipts.

(c) As hereinafter used the term "rent" shall be deemed to include the basic rent and the additional rent, if any, payable by Tenant to Landlord hereunder.

SECTION 4. Rent to Be Net to Landlord: It is the intention of the parties that the rent payable hereunder shall be net to Landlord, so that this lease shall yield to Landlord the net annual rent specified herein during the term of this lease, and that all rental taxes, costs, expenses and obligations of every kind and nature whatsoever relating to the Demised Premises shall be paid by Tenant (excepting, however, the Tenant Building Allowance to be paid by Landlord pursuant to Section 7 hereof).

SECTION 5. Use of Premises: (a) The Demised Premises may be used for the operation and maintenance of a movie theater, to include the right to offer and operate not more than ten (10) video machines incidental to and in conjunction with such theater use; or for any other lawful purpose subject to the approval of Landlord which shall not be unreasonably withheld so long as such other use shall not violate any "exclusive or prohibited use" covenant given by Landlord to any other of its tenants located in the Shopping Center. Landlord shall not withhold its consent to any such other use so long as such other use shall be in keeping with and not repugnant to the highest customary standards for shopping centers, e.g. Inlet Square, within Horry County. Furthermore, Tenant covenants that so long as it uses the Demised Premises for theater purposes it shall operate same in a manner consistent with accepted industry standards and shall not show any movies which are X-rated and deemed pornographic by the standards of Horry County or any municipality in which the Demised Premises may be located. (b) See attached Page 3A.

(c) Discontinuance of Business by Tenant: Should Tenant elect to discontinue the operation of a business within the Demised Premises at any time following the end of the fifteenth (15) year of the initial term or during any extended term of this lease and such cessation of business shall continue for six (6) consecutive months, Landlord shall have the option to cancel and terminate this lease. Provided, however, Landlord in order to exercise this option must give written notice to Tenant of its election to so terminate this lease within 30 days after the expiration of any such six month period during which Tenant's business shall have been discontinued. Upon the giving of such notice by Landlord, Tenant shall thereafter have the right within 30 days to commence reopening a business within the Demises Premises; and if Tenant fails to do so within such period, then this lease shall be terminated and Tenant shall thereupon be released from any and all further liability to Landlord thereunder.

(d) Continuous Operation by Tenant: Tenant agrees that a shopping center is an interdependent enterprise, that the Shopping Center's success is dependent on the continued operation of Tenant's business, and that maintenance of the character and quality of the Shopping Center is enhanced by the continued occupancy of the Demised Premises and the regular conduct of Tenant's business therein. Accordingly, Tenant agrees to open the Demised Premises for business on the Commencement Date provided in subsection 2(a) hereof and

3

(b)   Tenant's right to operate video machines within the
Demised Premises is subject to the following terms and conditions:
(i) Landlord or its designee shall have a modified right of first
refusal to supply the video machines to be operated in the Demised
Premises which right shall be exercised by Landlord or its designee
giving Tenant notice of its election to do so not more than thirty
(30) days following the date on which Tenant receives an offer (the
"Offer") from a third party supplier setting forth the terms and
conditions upon which video machines would be supplied to the
Demised Premises, maintained, repaired and replaced; (ii) following
said election Landlord, or its designee, and Tenant shall execute
an agreement (the "Video Machine Agreement") duplicating the terms
and provisions of the Offer with respect to the delivery,
maintenance, repair and replacement of the video machines, but
providing (notwithstanding any provision of the Offer to the
contrary) that the gross revenues derived from the operation of
said video games shall be divided equally between the parties
thereto; (iii) upon the expiration or sooner termination of the
Video Machine Agreement, Tenant shall have the right to obtain
video machines from any supplier; and (iv) if at any time during
the term of this lease Landlord determines (in the exercise of its
reasonable judgment as the operator of the Shopping Center) that
unrestricted access to the video machines by individuals who have
not purchased a theater ticket is encouraging loitering and/or an
assembly of persons within the area in sufficient numbers so that
their conduct or presence constitutes a nuisance or hazard to the
welfare or safety of other visitors to the Shopping Center, then
following notice of such determination from Landlord, Tenant shall
take all actions required to restrict access to the video machines
to individuals who have purchased theater tickets.

3-A

operate one hundred per cent (100%) of the Demised Premises during the first fifteen (15) years of the initial term under the name Litchfield Theatres or such other name as Landlord may approve in writing, with due diligence and efficiency so as to produce all of the gross receipts which may be produced by such manner of operation.  Tenant shall conduct its business in the Demised Premises on the same days and during the same hours that a majority of the other theaters owned and operated by Tenant located within a two hundred (200) mile radius of the Shopping Center are being operated from time to time during the term.  If Tenant fails to perform its obligations under this Section, Landlord shall be entitled to, at Landlord's election after giving ten (10) days written notice, immediate possession of the Demised Premises for the purpose of commencing reletting efforts, without prejudice in each instance to Landlord's right to damages and other remedies set forth in Section 24 hereof.  A vacation of premises or cessation of operations by any other tenant(s) in the Shopping Center shall not in any way release Tenant from Tenant's obligations under this lease, such obligations being independent covenants of this lease.

SECTION 6.   **Taxes, Common Area Maintenance Charges and Utilities:**  Tenant shall, during the term of this lease, as additional rent pay and punctually discharge:

(a)   All taxes imposed upon Tenant's rent, lease and business operation, including, without limitation, all sales taxes, value added taxes, documentary taxes, stamp taxes and other taxes assessed upon the consideration to be received by Landlord for this lease, upon all personal property of Tenant.

(b)(i) Tenant's share of real estate taxes as specified in this subsection 6(b).  Tenant's share of real estate taxes shall be computed by multiplying the total amount of such taxes by a fraction, the numerator of which shall be the number of square feet in the Demised Premises, and the denominator of which shall be the leasable floor area in the Shopping Center.  Tenant acknowledges and stipulates that Landlord has made no representation or agreement of any kind as to the total dollar amount of such taxes, actual or estimated, or Tenant's dollar share thereof.

(ii)   The term "real estate taxes" shall mean all taxes and assessments (special or otherwise) levied or assessed directly or indirectly against the Shopping Center (land, buildings and/or improvements as the same may be enlarged or reduced from time to time), and other taxes arising out of the use and/or occupancy of the Demised Premised imposed by federal, state, or local governmental authority or any other taxing authority having jurisdiction over the Shopping Center, including expenses directly incurred by Landlord in contesting the validity of, in seeking a reduction in, or in seeking to prevent an increase in any such tax(es) or assessment(s), but shall exclude franchise, capital stock, income, estate or inheritance taxes personal in nature to Landlord.

(iii)   Tenant shall pay its share of real estate taxes within thirty (30) days following Landlord's presentation to Tenant of a statement showing the total amount of said taxes and the computation of its share thereof.  In the event Landlord's mortgagee requires Landlord to escrow said taxes with mortgagee, then Landlord shall estimate the taxes referred to in this subsection 6(b), and Tenant shall pay one-twelfth (1/12) thereof monthly in advance, together with the payment of basic annual rent.  After the end of each calendar year Landlord shall furnish Tenant a statement in reasonable detail of the actual real estate taxes, prepared in accordance with sound accounting practices by Landlord's accounting department, and there shall be an adjustment between Landlord and Tenant, with payment to or repayment by Landlord, as the case may require, to the end that Landlord shall receive the entire amount of Tenant's annual share for such period.

4

(c)(i) A pro rata share (as determined by the ratio established in subsection 6(b)(i) above) of all exterior common area maintenance costs incurred by Landlord for the operation and maintenance of the exterior portions of the common areas. Tenant shall have the right to inspect or audit, during normal business hours, Landlord's records relating to all such charges. Such exterior common area maintenance charges to be paid in the same manner as Tenant's share of real estate taxes as established in subsection 6(b)(iii) above. Notwithstanding the foregoing, for so long as parking lot lights located in the area surrounding the Demised Premises are operated on a separate circuit by Landlord to facilitate Tenant's requests for extended hours of full illumination of the portions of the parking lot served by said lights, Tenant hereby agrees to pay to Landlord in addition to Tenant's share of exterior common area maintenance costs the excess utility charges incurred by Landlord as a result of keeping said lights at full illumination during periods when the remaining parking lot lights in the Shopping Center are being operated at reduced "security level" illumination.

(ii) "Exterior Common Area Maintenance Costs" shall mean the total cost and expense incurred in operating, maintaining and repairing the exterior common areas, including without limitation, surcharges levied upon or assessed against parking spaces or areas, payments toward mass transit or car pooling facilities or otherwise as required by federal, state or local governmental authorities; costs and expenses in connection with maintaining federal, state or local governmental ambient air and environmental standards, the cost of all materials, supplies and services purchased or hired, therefor; the cost and expense of landscaping, gardening and planting, cleaning, painting (including line painting), decorating, paving, lighting, sanitary control, removal of snow, trash, garbage and other refuse, including costs related to trash compactors; water and sewerage charges; the costs of all types of insurance coverages carried by Landlord covering the exterior common areas, including, without limitation, public liability, personal and bodily injury and property damage liability and automobile coverage, fire and extended coverage, vandalism and malicious mischief and all broad form coverages, sign insurance and any other insurance that may be carried by Landlord covering the exterior common areas all in the limits and with deductibles selected by Landlord; installing and renting of signs; installation, maintenance, operation, utility costs, repair and replacement of all exterior signs advertising the Shopping Center; maintenance, repair and replacement of utility systems serving the exterior common areas, including water and storm water lines and other utility lines, pipes and conduits; depreciation of the Shopping Center parking lot surfaces; depreciation of machinery and equipment owned and used in operation, maintenance and repair of the exterior common areas, or the rental charges for such machinery and equipment; the cost of personnel (including applicable payroll taxes, workmen's compensation insurance and disability insurance) to implement all of the foregoing, including security personnel for the exterior common areas and the directing of traffic and parking of automobiles on the parking areas thereof; and an overhead cost equal to fifteen percent (15%) of the total Exterior Common Area Maintenance Costs of maintaining the exterior common areas as such costs are defined in this subsection 6(c)(ii) (but there shall be excluded initial costs of equipment and other expenditures properly chargeable to capital account). Landlord may cause any or all of said services to be provided by an independent contractor or contractors.

(iii) All exterior common areas and other exterior common facilities (hereinafter collectively called "exterior common areas") made available by Landlord in or about the Shopping Center shall be subject to the exclusive control and management of Landlord, expressly reserving to Landlord, without limitation, the right to erect and install within the malls or the parking areas, kiosks,

5

planters, pools, sculpture, free-standing buildings, additional
stories to buildings, or otherwise.  Exterior common areas (as
initially constructed or as the same may be enlarged or reduced at any
time thereafter) shall mean all areas, space, facilities, equipment,
signs and special services from time to time made available by
Landlord for the common and joint use and benefit of Landlord, the
Tenant and other tenants and occupants of the Shopping Center, and
their respective employees, agents, subtenants, concessionaires,
licensees, customers and invitees, which may include (but shall not
be deemed a representation as to their availability), the sidewalks,
parking areas, access roads, driveways, landscaped areas, truck
serviceways, tunnels, loading docks, pedestrian malls (enclosed or
open), courts, stairs, ramps, elevators, escalators, comfort and first
aid stations, public washrooms, community hall or auditorium and
parcel pick-up stations.  Landlord hereby expressly reserves the right
from time to time, to construct, maintain, and operate lighting and
other facilities, equipment and signs on all of said exterior common
areas; to police the same; to change the area, level, location and
arrangement of the parking areas and other facilities forming a part
of said exterior common areas; to build multi-story parking
facilities; to restrict parking by tenants and other occupants of the
Shopping Center and their employees, agents, subtenants,
concessionaires and licensees; to enforce parking charges (by
operation of meters or otherwise), but in such event the net proceeds
from such charges, (except for proceeds from multi-story parking
facilities constructed after the initial construction of the Shopping
Center), after deducting the cost of enforcing the same or charges
thereon by governmental authority, shall be applied in reduction of
the cost of maintaining the exterior common areas; to close
temporarily all or any portion of the exterior common areas for the
purpose of making repairs or changes thereto and to discourage non-
customer parking; to establish, modify and enforce reasonable rules
and regulations with respect to the exterior common areas and the use
to be made thereof; and to grant individual tenants the right to
conduct sales in the exterior common areas.  Landlord shall operate,
manage, equip, light and maintain the exterior common areas in such
manner as Landlord may from time to time determine, and Landlord shall
have the right and exclusive authority to employ and discharge all
personnel with respect thereto.  Tenant is hereby given a non-
exclusive license to use, during the Term, the exterior common areas
of the Shopping Center as they may now or at any time during the Term
exist, provided, however, that if the size, location or arrangement
of such exterior common areas or the type of facilities at any time
forming a part thereof be changed or diminished, Landlord shall not
be subject to any liability therefor, nor shall Tenant be entitled to
any compensation or diminution or abatement of rent therefor, nor
shall such change or diminution of such areas be deemed a constructive
or actual eviction.  Landlord reserves the right to grant to third
persons the non-exclusive right to cross over and use in common with
Landlord and all tenants of the Shopping Center the exterior common
areas as designated from time to time by Landlord.  In order to
establish that the Shopping Center and any portion thereof is and will
continue to remain private property and to prevent a dedication
thereof or the accrual of any rights to any person or the public
therein, Landlord hereby reserves the unrestricted right to close all
or any portion of the Shopping Center owned, leased or controlled by
Landlord to the general public for one (1) day in each calendar year,
and, in connection therewith, to seal off all entrances to the
Shopping Center, or any portion thereof.  Tenant hereby acknowledges,
consents and agrees that any and/or all services, facilities and
access by the public to the Demised Premises and/or to the Shopping
Center may be suspended in whole or in part during such temporary
times as any of the department stores in the Shopping Center are not
open for business, on legal holidays, or such other days as may be
declared by local, state or federal authorities as days of observance,
and/or during any periods of actual or threatened civil commotion,
insurrection or other circumstances beyond Landlord's control.

6

(d)(i) As and when the same become due and payable, all water rents, rates and charges, all sewer rents and all charges for electricity, gas, heat, steam, hot and/or chilled water, air conditioning, ventilating, lighting systems, and other utilities supplied the Demised Premises including those provided on a temporary basis during construction of the improvements on the Demised Premises. If any such utilities are not separately metered or assessed and used in common with other tenants in the Shopping Center, Tenant will pay in accordance with subsection 6(b)(i) hereof.

(ii) Landlord may install re-registering meters and collect any and all charges aforesaid from Tenant, making returns to the proper public utility company or governmental unit, provided that Tenant shall not be charged more than the rates it would be charged for the same services if furnished directly to the Demised Premises by such companies or governmental units. At the option of Landlord, any utility or related service which Landlord may at any time elect to provide to the Demised Premises may be furnished by Landlord or any agent employed, or independent contractor selected by Landlord, and Tenant shall accept the same therefrom to the exclusion of all other suppliers, so long as the rates charged by the Landlord or by the supplier of such utility or related service are competitive.

(iii) Notwithstanding anything else contained in this lease to the contrary, Landlord shall have the right, at any time and from time to time, to cause one or more utilities (including, without limitation, any heating, ventilating, air conditioning, and/or lighting systems serving the Demised Premises and/or any other Shopping Center areas) to be furnished by means of an on-site or off-site energy system and/or to provide some other alternative energy system (whether so-called "total energy" or otherwise) in lieu of the direct furnishing of the same to Tenant and other occupants of the Shopping Center from the appropriate utility company, and Tenant agrees in any such case, to accept any such utility from such alternative source in lieu of the appropriate utility company directly and to pay Landlord and/or such alternative source or other designee as Landlord shall determine all costs and charges therefor provided that the same shall not result in any additional cost or expense of the energy to Tenant over and above that which it would pay if it purchased same directly from the appropriate utility company; and provided further that same is in compliance with all laws, regulations, ordinances and other governmental requirements. Landlord shall have no liability to Tenant for disruption of any utility service, and in no event shall such disruption constitute constructive eviction or entitle Tenant to an abatement of rent or other charges.

(e) At Landlord's election, Landlord or its designee may collect from Tenant as additional rent under this lease an Environmental Charge which may contain, without limitation, the following items which Landlord may supply to the Demised Premises.

(i) **Electricity.** If Landlord elects as an element of said Environmental Charge to supply electricity, then Tenant shall use electricity supplied by Landlord as Tenant's sole source of energy. Landlord may obtain electricity from a public utility company or a private generating plant and same shall be supplied to Tenant, for Tenant's reasonable use in connection with such lighting, heating and air conditioning systems and such other electrical appliances and equipment (Tenant's Electrical Installations) as may be installed in the Demised Premises with Landlord's permission. The "Electrical Charge" as hereinafter defined shall as a component of the Environmental Charge be deemed additional rent under this lease.

Since Tenant's Electrical Installations are not presently ascertainable, Tenant agrees that Landlord's engineer shall make, at any time and from time to time, a survey and an estimate of the energy which will be used by Tenant's Electrical Installations. The energy estimate shall be based upon data obtained from Tenant's plans and specifications as verified by a survey of Tenant's premises following

7

completion of Tenant's construction work, and shall take into consideration the Tenant's hours of usage of connected electrical loads consisting primarily of lighting and air-conditioning equipment and other miscellaneous electric equipment as may be installed and controlled by Tenant. Landlord's engineer shall use the aforesaid survey estimate to establish as a component of the Environmental Charge the Tenant's Monthly "Electrical Charge" which shall be one-twelfth (1/12) of the Tenant's annual charge for electrical energy. In connection with such survey, Tenant shall supply Landlord upon request with the information necessary to estimate Tenant's connected load. Tenant shall be notified of the survey findings which shall be conclusive and binding upon the parties. Tenant shall pay to Landlord monthly in advance together with the payment of basic annual rent as a portion of the Environmental Charge a sum equal to Tenant's monthly Electrical Charge which shall be based upon the aforesaid survey.

The Electrical Charge shall include a proportionate cost, based on the number of Tenant's sharing a particular meter, of the central electrical distribution system but only that portion from the electric meter to the Demised Premises, including the cost of the electric meter Tenant would have paid had electricity not been supplied by Landlord, but shall exclude the cost of the conduit provided by Landlord. Also, the Electrical Charge shall include a reasonable allowance for Landlord's survey, billing and administrative expenses, and Landlord's costs of repair and maintenance of Landlord's electrical supply system. The Electrical Charge may be revised by Landlord from time to time to reflect an increase or decrease in the following: taxes, costs of repair and maintenance of Landlord's electrical supply system, rates charged to similar consumers by the Local Utility Company, Tenant's connected load, any adjustment required as a result of actual operating experience, and seasonal requirements. The portion of Tenant's Environmental Charge attributable to the annual Electrical Charge component shall not exceed the total charges (including taxes) which Tenant as the operator of a separately metered and billable facility would otherwise pay to the applicable municipality, governmental authority or utility company serving the area in which the Shopping Center is located ("Local Utility Company") if such electrical energy were not supplied by Landlord and had Tenant purchased such electricity directly.

Notwithstanding anything contained herein to the contrary, Landlord shall at Tenant's written request and expense, install a check meter to measure electrical energy consumed by Tenant in the Demised Premises no more than once annually. If the check meter discloses that the consumption of the electrical energy in the Demised Premises for such period is different from the amount Landlord's engineer estimated to be consumed therein, then, Tenant's annual total Electrical Charge for the next annual period shall be adjusted to reflect the electrical energy consumed in the Demised Premises. Landlord shall submit a statement to Tenant after the check meter results have been obtained setting forth (1) the manner of calculation of Tenant's Electrical Charge, and (2) the adjustment, if any, in the Electrical Charge. The amount charged to Tenant as a component of the Environmental Charge which is attributable to the electricity consumed in the Demised Premises shall be as herein before described.

In no event shall payment of the Electrical Charge component of the Environmental Charge abate, nor shall Tenant have any right of offset or counterclaim against the payment of such Electrical Charge component of the Environmental Charge.

(ii) **Water.** If Landlord elects as an element of said Environmental Charge to supply water ("Water Service"), then Tenant shall use Water Service supplied by Landlord as Tenant's sole source of Water Service. The "Water Charge" as hereinafter defined shall as a component of the Environmental Charge be deemed additional rent under this lease.

8

Since Tenant's water consumption is not presently ascertainable, Tenant agrees that Landlord's engineer shall make, at any time and from time to time, a survey and an estimate of the water (including taxes and sewer charges) which will be used by Tenant in the Demised Premises. The water estimate shall be based upon data obtained from Tenant's plans and specifications as verified by a survey of Tenant's premises following completion of Tenant's construction work, and shall take into consideration the Tenant's usage of water in the Demised Premises. Landlord's engineer shall use the aforesaid survey estimate to establish as a component of the Environmental Charge the Tenant's monthly "Water Charge" which shall be one-twelfth (1/12) of the Tenant's annual charge for water service. In connection with such survey, Tenant shall supply Landlord upon request with the information necessary to estimate Tenant's water consumption. Tenant shall be notified of the survey findings which shall be conclusive and binding upon the parties. Tenant shall pay to Landlord monthly in advance together with the payment of basic annual rent as a portion of the Environmental Charge a sum equal to Tenant's monthly Water Charge which shall be based upon the aforesaid survey.

There shall be included in the Water Charge a reasonable allowance for Landlord's survey, the cost of a water meter Tenant would have paid had water not been supplied by Landlord, billing and administrative expenses, and Landlord's cost of repair and maintenance of Landlord's water supply system. The Water Charge may be revised by Landlord from time to time to reflect an increase or decrease in the following: taxes, costs of repair and maintenance of Landlord's water supply system, rates charged to similar consumers by the Local Utility Company, Tenant's consumption, any increase required as a result of actual operating experience, and seasonal requirements. The portion of Tenant's Environmental Charge attributable to the annual Water Charge component shall not exceed the total charges (including taxes) which Tenant as the operator of a separately metered and billable facility would otherwise pay to the applicable municipality, governmental authority or utility company serving the area in which Shopping Center is located ("Local Utility Company") if such water service were not supplied by Landlord and had Tenant purchased such water directly.

Notwithstanding anything contained herein to the contrary, Landlord shall at Tenant's written request and expense, install a check meter to measure water consumed by Tenant in the Demised Premises no more than once annually. If the check meter discloses that the consumption of water in the Demised Premises for such period is different from the amount Landlord's engineer estimated to be consumed therein, then, Tenant's annual total Water Charge for the next annual period shall be adjusted to reflect the water consumed in the Demised Premises. Landlord shall submit a statement to Tenant after the check meter results have been obtained setting forth (1) the manner of calculation of Tenant's Water Charge; and (2) the adjustment, if any, in the Water Charge. The amount charged to Tenant as a component of the Environmental Charge which is attributable to the water consumed on the Demised Premises shall be as hereinbefore described.

In no event shall payment of the Water Charge component of the Environmental Charge abate, nor shall Tenant have any right of offset or counterclaim against the payment of such Water Charge component of the Environmental Charge.

(iii) If Landlord hereafter determines that it is not feasible, in Landlord's sole judgment, to supply or to continue supplying as elements of the Environmental Charge electricity or Water Service, or if it shall hereafter become unlawful for Landlord to supply electricity or Water Service, then Landlord may discontinue providing any or all of such services. In such event Tenant shall purchase water and/or electricity, as the case may be, directly from the appropriate utility company(s), and Tenant shall at Tenant's sole

9

cost and expense cause the Demised Premises to be separately metered and billable.

(iv) Tenant agrees that Landlord shall not be liable to Tenant for disruption or diminution of any utility service nor for any shortages or curtailments on the use of any utility services, and in no event shall such disruption, shortages or curtailments constitute an eviction, actual or constructive, or entitle Tenant to damages nor to any abatement of basic annual rent or other charges due under this lease.

(v) In the event Tenant fails to pay any sum due under this Section, Landlord may, in addition to all other remedies, cease supplying the utility service(s) to which such nonpayment relates while such nonpayment exists.

(vi) If Landlord is required to pay a deposit to the utility company servicing the Shopping Center, Tenant herewith agrees to pay its share of said deposit by paying to Landlord a utility deposit in an amount equal to two months Electrical Charge payable within ten (10) days after receipt of the bill therefor.

SECTION 7. **Plans and Specifications and Construction:**

(a) Tenant, at its expense, shall, within thirty (30) days from the date of this lease, cause to be prepared plans and specifications for the construction of a multiplex movie theater (containing approximately 25,220 square feet, with up to 1,454 seats) upon the Demised Premises which shall be submitted to Landlord for its approval which shall not be unreasonably withheld. Landlord agrees to either approve such plans or to state its reasons for disapproval in writing to Tenant within thirty (30) days of its receipt of such plans and specifications. Upon any such disapproval, Tenant shall have thirty (30) days in which to revise and resubmit same to Landlord for its approval, which shall be either given or denied in writing to Tenant within ten (10) days of its receipt of the revised plans and specifications. Failure of Landlord to so notify Tenant within the permitted time(s) above specified shall be deemed to conclusively constitute Landlord's approval of any such plans and specifications.

Within fifteen (15) days of Tenant's receipt of Landlord's approval of the plans and specifications as above provided, Tenant, at its expense, shall apply for and use its best efforts to obtain a building permit based upon such approved plans and specifications from the applicable municipal or governmental authority. Upon receipt of such building permit, Tenant, at its expense (but subject to its rights to receive from Landlord the Tenant's building allowance as hereinafter provided in this Section), shall thereupon promptly institute and thereafter diligently prosecute to completion the construction of a theater upon the Demised Premises in accordance with the approved plans and specifications therefor and applicable governmental ordinances and regulations relating thereto; all to be done in a good, workmanlike manner.

In partial consideration of Tenant's construction upon the Demised Premises as above provided, Landlord shall pay to Tenant a Building Allowance equal to a total amount of $30.00 for each square foot of gross area contained within the theater (measured from the outside of the exterior walls thereof) to be constructed as determined from the approved plans and specifications therefor. Said Building Allowance shall be paid to Tenant monthly as construction progresses in an amount equal to ninety (90%) per cent of the monthly "Construction Costs" incurred by Tenant therefor with the balance, if any, to be paid upon (i) completion of construction, (ii) the issuance of a Certificate of Occupancy for the theater by the applicable governmental agency, (iii) the issuance by Tenant's architect of a certificate confirming that construction of the improvements upon the Demised Premises has been completed in accordance with the approved plans and specifications and (iv) the execution and delivery of an

10

estoppel certificate by Tenant to Landlord.  For purposes hereof, Tenant's Construction Costs shall include all costs incurred necessary to construct the theater upon the Demised Premises, to include architectural and engineering costs associated therewith.  Tenant shall submit to Landlord monthly during and again upon completion of construction an affidavit that all such costs incurred to date thereof have been paid in full, together with lien waivers from the general contractor constructing same.

SECTION 8.  **Improvements, Repairs, Additions, Replacements:**

(a)  Tenant shall have the right, at its own cost and expense, to construct on any part or all of the Demised Premises, at any time and from time to time, such buildings, parking areas, driveways, walks, gardens and other similar and dissimilar improvements as Tenant shall from time to time determine, provided that the same shall be (i) in compliance with all then applicable building codes and ordinances and (ii) approved by Landlord as to the structural and exterior components thereof.

(b)  The Tenant shall, at all times during the term of this lease, and at its own cost and expense, keep and maintain or cause to be kept and maintained in repair and good condition (ordinary wear and tear excepted), all buildings (except the roof, floor slab and side walls thereof which shall be the responsibility of Landlord to maintain; provided, Tenant (i) assigns to Landlord the general contractor's warranty (which warranty shall be for a period of not less than one (1) year) together with all other warranties which are issued with respect to such components of the theater building, (ii) supplies to Landlord a certification from Tenant's architect that the theater and other improvements constructed on the Demised Premises have been constructed in accordance with the approved plans and specifications and (iii) agrees to permit Landlord to employ, at Landlord's expense, a construction consultant to monitor the work as it progresses and the conformity thereof to the approved plans and specifications) and improvements at any time erected on the Demised Premises, and shall use all reasonable precaution to prevent waste, damage or injury.

(c)  Subject to Landlord's prior approval which shall not be unreasonably withheld, Tenant may, at its option and at its own cost and expense, at any time and from time to time, make such alterations, changes, replacements, improvements and additions in and to the Demised Premises, and the buildings and improvements therein, as it may deem desirable, including the demolition of any building(s) and improvement(s) and/or structure(s) that now or hereafter may be situate or erected on the Demised Premises in accordance with plans and specifications therefor which have been approved by Landlord; provided, however, that Tenant shall reconstruct upon the Demised Premises improvements having a fair market value equal to or greater than the fair market value of the demolished improvements as determined immediately prior to such demolition.  Notwithstanding anything to the contrary contained herein, Tenant shall not make or cause to be made any roof penetrations except as expressly approved and/or performed by Landlord or its general contractor for the Shopping Center.

(d)  On the last day or sooner termination of the term of this lease, Tenant shall quit and surrender the Demised Premises, and the buildings and permanent improvements then thereon, broom clean and in good condition and repair (ordinary wear and tear excepted) and all improvements situate upon the Demised Premises shall thereupon become the sole and exclusive property of the Landlord.

SECTION 9.  **Requirements of Public Authority:**  (a) During the term of this lease, Tenant shall, at its own cost and expense, promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of the Federal, State, County, Town, Village and City Governments and

11

all other governmental authorities affecting the Demised Premises or appurtenances thereto or any part thereof whether the same are in force at the commencement of the term of this lease or may in the future be passed, enacted or directed, and Tenant shall pay all costs expenses, liabilities, losses, damages, fines, penalties, claims and demands, including reasonable counsel fees, that may in any manner arise out of or be imposed because of the failure of Tenant to comply with the covenants of this Section 9.

(b)  Tenant shall have the right to contest by appropriate legal proceedings diligently conducted in good faith, in the name of the Tenant or Landlord (if legally required), or both (if legally required), without cost or expense to Landlord, the validity or application of any law, ordinance, rule, regulation or requirement of the nature referred to in subsection 9(a) hereof and, if by the terms of any such law, ordinance, order, rule, regulation or requirement, compliance therewith may legally be delayed pending the prosecution of any such proceeding, Tenant may delay such compliance therewith until the final determination of such proceedings.

(c)  Landlord agrees to execute and deliver any appropriate papers or other instruments which may be necessary or proper to permit Tenant so to contest the validity or application of any such law, ordinance, order, rule, regulation or requirement and to fully cooperate with Tenant in such contest.

SECTION 10. **Covenant Against Liens**: If, because of any act or omission of Tenant, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Landlord or any portion of the Demised Premises or the Shopping Center, Tenant shall, at its own cost and expense, cause the same to be discharged of record or bonded within fifteen (15) days after written notice from Landlord to Tenant of the filing thereof; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees, resulting therefrom,

SECTION 11. **Access to Premises**: Landlord or Landlord's agents and designees shall have the right, but not the obligation, to enter upon the Demised Premises at all reasonable times and after written notice in advance of each such entry (except emergency situations in which Landlord shall use reasonable efforts to provide such notice as shall be practicable under the circumstances) to Tenant to examine same and to-exhibit the Demised Premises to prospective purchasers and prospective tenants, but in the latter case only during the last six (6) months of the term of this lease. Landlord shall be permitted to affix a "To Let" or "For Sale" sign on the Demised Premises during the last ninety (90) days of the term of this lease in such place as shall not interfere with the business then being conducted at the Demised Premises.

SECTION 12. **Assignment and Subletting**: Tenant may assign or sublease (in whole or in part or parts), all or any part of the Demised Premises and may permit its subtenant or subtenants to assign or sublease (in whole or in part or parts), all or any part of the Demised Premises, without requiring Landlord's consent therefor; provided, however, each such assignee or subtenant shall operate the Demised Premises as a theater and (i) own and/or operate on the date of said assignment or sublease other theaters containing at least forty (40) screens or (ii) have a net worth on said date of not less than Two Million Dollars ($2,000,000.00). Landlord agrees to review any requested assignment or subletting which requires Landlord's consent upon receipt of any such request and not to unreasonable withhold, delay or deny its consent thereto. Tenant agrees to furnish to Landlord written notice of the assignment of this lease or subletting of the Demised Premises within thirty (30) days thereafter, together with the name and address of the assignee or sublessee; provided, however, that Tenant shall not be relieved of any liability hereunder by reason of any such assignment or sublease.

12

SECTION 13. **Signs**: Tenant and Tenant's assignees and subtenants shall have the right to install, maintain and replace in, on or over or in front of the Demised Premises or in any part thereof and in a free-standing location designated on Exhibit "A" such signs and advertising matter as shall comply with (i) the criteria set forth on Exhibit "B" annexed hereto and made a part hereof and (ii) any applicable requirements of governmental authorities having jurisdiction and shall obtain any necessary permits for such purposes. As used in this Section 13, the word "sign" shall be construed to include any placard, light or other advertising symbol or object, irrespective of whether same be temporary or permanent. Landlord shall, at its election, advise Tenant that it shall have the right to either (i) construct and maintain, at Tenant's sole expense, a free-standing pylon sign and readerboard in the location provided therfor on Exhibit "A" or (ii) install a sign panel and readerboard approved by Landlord and supplied by Tenant on a pylon sign which Landlord erects to identify the Shopping Center and other occupants thereof in which case Tenant shall contribute its pro rata share of the costs of maintaining, operating and repairing said pylon sign.

SECTION 14. **Indemnity**: (a) Tenant shall indemnify and save harmless Landlord from and against any and all liability, damage, penalties or judgments arising from injury to person or property sustained by anyone in and about the Demised Premises resulting from any act or acts or omission or omissions of Tenant, or Tenant's officers, agents, servants, employees, contractors, or sublessees. Tenant shall, at its own cost and expense, defend any and all suits or actions (just or unjust) which may be brought against Landlord or in which Landlord may be impleaded with others upon any such above mentioned matter, claim or claims, except as may result from the acts set forth in subsection 14(b) hereof.

(b) Except for its affirmative acts or negligence or the affirmative acts or negligence of its officers, agents, servants, employees or contractors, Landlord shall not be responsible or liable for any damage or injury to any property, fixtures, buildings or other improvements, or to any person or persons, at any time on the Demised Premises, including any damage or injury to Tenant or to any of Tenant's officers, agents, servants, employees, contractors, customers or sublessees.

SECTION 15. **Insurance**: (a) Tenant shall provide at its expense and keep in force during the term of this lease, general liability insurance in a good and solvent insurance company or companies licensed to do business in the State of South Carolina selected by Tenant, and reasonably satisfactory to Landlord, in the amount of at least One Million and No/100 ($1,000,000.00) Dollars with respect to injury or death to any one person and Three Million and No/100 ($3,000,000.00) Dollars with respect to injury or death to more than one person in any one accident or other occurrence and One Hundred Thousand and No/100 ($100,000.00) Dollars with respect to damages to property. Such policy or policies shall include Landlord as assured. Tenant agrees to deliver certificates of such insurance to Landlord at the beginning of the term of this lease and thereafter not less than ten (10) days prior to the expiration of any such policy. Such insurance, shall be non-cancellable without ten (10) days written notice to Landlord and any mortgagee of Landlord of which Tenant has notice.

(b) During the term of this lease, Landlord shall keep all buildings and improvements erected by Tenant on the Demised Premises at any time insured for the benefit of Landlord and Tenant, as their respective interests may appear, against loss or damage by fire and customary extended coverage in a minimum amount necessary to avoid the effect of coinsurance provisions of the applicable policies. All such policies or certificates thereof, shall be held by Landlord. All proceeds payable at any time and from time to time by any insurance company under such policies shall be payable to Landlord, in trust, subject to Tenant's election to have such monies applied

13

toward the reasonable costs incurred by Tenant necessary for the repair, replacement or rebuilding of the destroyed or damaged improvements pursuant to Section 17 hereof. To the extent such insurance monies exceed such costs incurred by Tenant, the excess monies not so applied shall be paid to Landlord and Tenant shall have to further interest therein or rights thereto. Landlord and Tenant shall cooperate fully in order to obtain the largest possible recovery and execute any and all consents and other instruments and take all other actions necessary or desirable in order to effectuate same and to cause such proceeds to be paid as hereinbefore provided and neither shall carry any insurance concurrent in coverage and contributing in the event of loss with any insurance required to be furnished by Tenant hereunder if the effect of such separate insurance would be to reduce the protection or the payment to be made under Tenant's insurance. Tenant shall pay to Landlord its pro rata share of such insurance premiums in the same manner as set forth in subsection 6(b)(i) of this lease.

(c) Any insurance required to be provided by Landlord pursuant to this lease may be provided by blanket Insurance covering the Demised Premises and other locations.

SECTION 16. **Waiver of Subrogation:** All insurance policies carried by either party covering the Demised Premises, including, but not limited to, contents, fire and casualty insurance, shall expressly waive any right on the part of the insurer against the other party. The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same shall be obtainable without extra cost, or if extra cost shall be charged therefor, so long as the other party pays such extra cost. If extra cost shall be chargeable therefor, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so.

SECTION 17. **Destruction:** (a) In the event, that at any time during the term of this lease, the buildings and improvements on the Demised Premises shall be destroyed or damaged in whole or in part by fire or other cause within the extended coverage of the fire insurance policies carried by Tenant in accordance with this lease, then, Tenant, to the extent of the insurance proceeds available to Tenant therefor pursuant to Section 15 hereof, shall, subject to the provisions of subsection 17(b) hereof, cause the same to be repaired, replaced or rebuilt within a period of time which, under all prevailing circumstances, shall be reasonable.

(b) If the aggregate ground floor area of the destroyed improvements resulting from such fire or other cause shall exceed twenty-five (25%) percent of the aggregate ground floor area of all buildings on the Demised Premises immediately prior to such damage or destruction, or if such destruction shall occur during the last four (4) years of the initial term or any extended term hereof, Tenant shall have the right, but not the obligation, to elect not to repair, replace or rebuild any such damaged or destroyed improvements, as the case may be, and to terminate this lease by giving written notice of termination to Landlord on or prior to the date four (4) months after the occurrence of such damage or destruction, and upon the giving of such notice of termination the term of this lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed herein as the expiration date of the term of this lease, and neither party shall have any further rights or liabilities hereunder. In the event of any such termination of the term of this lease by Tenant, Landlord shall be entitled to the net proceeds of any insurance allocable to the damaged or destroyed improvements located upon the Demised Premises.

(c) If as a result of damage to or destruction of the improvements on the Demised Premises due to fire, the elements or other casualty, the whole or any part of the Demised Premises shall

14

become untenable or unfit for Tenant's use which pre-existed such damage or destruction, all rentals and additional rentals due Landlord by Tenant under this lease shall be equitably abated during the continuance of such condition. And if Landlord and Tenant are unable to mutually agree upon such rental abatement, then each agrees to select an MAI appraiser and for such two appraisers so chosen to select a third MAI appraiser and for such appraisers to determine whether the rentals should be abated and, if so, for how long and in what amount; such determination shall be conclusively binding upon Landlord and Tenant.

SECTION 18. **Eminent Domain:** (a) If the whole of the Demised Premises shall be taken for any public or quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, then this lease shall automatically terminate as of the date that possession has been taken. In the event of a partial taking (or purchase) of the Demised Premises pursuant to which more than twenty-five (25%) percent of either the Demised Premises or the aggregate floor area of any building located thereon are so taken (or so purchased), then Tenant shall have the right, but not the obligation, to terminate this lease by giving written notice of such termination to Landlord on or prior to the date ninety (90) days after the date of such taking (or purchase) and upon the giving of such notice of termination, the term of this lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed herein as the expiration date of the term of this lease. In the event the lease shall terminate or shall be terminated, the rental shall, if and when necessary, be adjusted to the day of the taking (or purchase) and neither party shall have any further rights or liabilities hereunder.

(b) In the event of a taking (or purchase) resulting in the termination of this lease pursuant to the provisions of subsection 18(a) hereof, the parties hereto agree to cooperate in applying for and in prosecuting any claim for such taking and further agree, that the aggregate net award, after deducting all expenses and costs, including attorney's fees, incurred in connection therewith, payable to both Landlord and Tenant shall be paid to Tenant, in trust, and distributed as follows:

Landlord and Tenant agree to request the Court in any such condemnation proceedings to make separate awards to Landlord and Tenant as to their respective interests. If for any reason the Court is unwilling or unable to make separate awards or in the event of a voluntary conveyance in lieu of condemnation, Landlord and Tenant agree to each select an MAI appraiser, and for such two appraisers so chosen to select a third MAI appraiser, and for such appraisers to determine the value ratio of the value of the leasehold interest in the property so condemned as compared to the value of the fee simple interest in the property so condemned. The value ratio thus established shall then be applied to the total condemnation proceeds, and such proceeds shall be accordingly distributed between Tenant and Landlord.

(c)(i) In the event of a partial taking (or purchase) not resulting in the termination of this lease, pursuant to the provisions of subsection 18(a) hereof, Tenant shall, at its own cost and expense, make all repairs to the buildings and improvements on the Demised Premises affected by such taking (or purchase) to the extent necessary to restore the same to a complete architectural unit (to the extent permitted, however, taking into consideration the amount of land remaining after any such taking or purchase); provided, however, that Tenant shall not be obligated to expend an amount in excess of the proceeds of the net award available to Tenant for such purposes, as hereinafter provided.

(ii) All compensation available or paid to Landlord and Tenant upon such a partial taking (or purchase), shall be paid to

15

Tenant for the purpose of paying towards the cost of such restoration, or, in the event that the parties hereto agree that only a portion of the aggregate award is sufficient to so restore, then only such portion as agreed upon shall be paid to Tenant for such purpose and the balance shall be distributed pursuant to paragraph (iii) of this subsection 18(c).

(iii) All compensation available or paid to Landlord and Tenant upon such a partial taking (or purchase) in excess of the amount thereof needed by Tenant to repair and restore the buildings and improvements shall be distributed in the same manner as is provided in subsection 18(b) hereof.

SECTION 19. **Utility Easements:**    Landlord shall bring utilities to the boundary of the Demised Premises (or to points which are within five (5) feet of the proposed location of the exterior walls of the theater building to be constructed thereon if said exterior walls are to be located more than five (5) feet from the boundary of the Demised Premises) at locations designated on the approved plans and specifications for the theater building and/or provide Tenant with easements to the existing meter panels or utility lines.

SECTION 20. **Nonexclusive Easements:**    At no additional rental, cost, fee, or charge of any kind and nature whatsoever to Tenant, Landlord hereby further demises unto Tenant, its subtenants and assigns and their respective employees, agents, contractors, customers, visitors, invitees, licensees, and concessionaires a non-exclusive easement for the passage and parking of vehicular traffic and for the accommodation of pedestrians from and to the Demised Premises, over and across the roadways and parking areas of the Shopping Center that are described in site plan therefor, together with the nonexclusive easement to tap onto and use existing utility lines and systems within the Shopping Center which shall include, without being limited to, sanitary sewers, storm drains, water and gas mains, electrical power and telephone lines and other underground utility lines or systems. Landlord covenants that at all times during the term of this Lease, the number of parking spaces provided for use by Tenant and all of Landlord's other tenants in the Shopping Center shall conform to all applicable parking codes of any county, city, state, or municipal codes having jurisdiction over the Shopping Center. In the event any applicable parking code shall be hereinafter amended to require additional parking which the Landlord can not provide, then Tenant,—at its election, shall have the right to terminate this lease. Tenant shall also have, at no additional cost, such easements as shall be reasonably necessary for Tenant at its expense to construct and maintain a pylon sign (or, at Landlord's election, to install readerboards on a pylon sign for the Shopping Center) on Landlord's property (outside the Demised Premises) but within the Shopping Center along U. S. Highway 17 By-Pass; the exact location of this sign shall be subject to Landlord's consent, which shall not be unreasonably withheld.

SECTION 21. **Performance by Assignee or Subtenant:**  Any act required to be performed by Tenant pursuant to the terms of this lease may be performed by any assignee or sublessee of Tenant occupying all or any part of the Demised Premises and the performance of such acts shall be deemed to be performed by Tenant and shall be acceptable as Tenant's act by Landlord.

SECTION 22. **Quiet Enjoyment:**  (a) Tenant, upon paying the basic annual rent and additional rent and all other sums and charges to be paid by it as herein provided, and observing and keeping all covenants, warranties, agreements and conditions of this lease on its part to be kept, shall quietly have and enjoy the Demised Premises during the term of this lease, without hindrance or molestation by anyone.

16

(b)  Landlord represents and warrants to Tenant that it has fee simple title to the Demised Premises and the non-exclusive easements referred to in Section 20 hereof and the power and authority to execute and deliver this lease and to carry out and perform all covenants to be performed by it hereunder.  Landlord further represents and warrants to Tenant:

(1)  That the Demised Premises and said non-exclusive easements are free from all encumbrances, liens, defects in title, violations of law, leases, tenancies, easements, restrictions and agreements except those as set forth on Exhibit "C" annexed hereto and made a part hereof which shall not materially interfere with Tenant's use and enjoyment of the Demised Premises;

(2)  That at the time of the commencement of the term, sole and undisturbed physical possession of the entire Demised Premises will be delivered to Tenant free and clear (except as set forth in Exhibit "C") of all liens, defects in title, encumbrances, restrictions, agreements, easements, tenancies and violations of law;

(3)  That the Demised Premises is and shall be at the commencement of the term of this Lease zoned so that Tenant can construct thereon the theater as specified in Section 7 hereof in accordance with the plans and specifications therefor as mutually agreed upon by Landlord and Tenant;

(4)  That there is currently available to the Demised Premises such utilities as may be necessary or desirable to serve the Demised Premises and such theater to be located thereon.  Such utilities shall include without being limited to: water, sewer, storm, natural gas, drainage, electricity and telephone, which shall be "stubbed in" or otherwise made available by Landlord to the Demised Premises in accordance with the provisions of Section 19 hereof;

(5)  That Landlord shall obtain from applicable governmental authorities all curb cuts necessary to allow ingress to and egress from the Demised Premises and adjoining public highways and private roadways as shall be shown on the aforesaid approved plans and specifications;

(6)  That Landlord will construct and maintain the Shopping and all exterior common areas including parking spaces, roads, drives, entrances, exits, in accordance with the existing plans and specifications therefor; said construction to be completed on or before the Commencement Date of this lease as specified in Section 2 hereof; and

(7)  That Landlord agrees that it will maintain in good order and condition, as a part of the common area maintenance, all parking areas, exits, entrances and driveways in the Shopping Center, together with adequate illumination thereof.

(c)  It is hereby understood and agreed that the approval by Landlord of Tenant's plans and specifications within the time provided in Section 7 hereof shall be a condition precedent to Tenant's liability under this lease.

SECTION 23. Landlord's Right to Mortgage and Require Tenant's Subordination: Notwithstanding the provisions of subsection 22(b) hereof, Landlord shall have the right to mortgage ("Mortgage") its fee simple interest in and to the Demised Premises and the non-

17

exclusive easements referred to in Section 20 hereof and to require Tenant to subordinate its rights and leasehold created under this lease and its attornment to any such mortgagee ("Mortgagee") which shall be accomplished by the execution of a Non-Disturbance, Attornment and Subordination Agreement by Landlord, its Mortgagee and Tenant which shall provide that:

(i) (Non-Disturbance) So long as no default exists, nor any event has occurred, which has continued to exist for such period of time (after notice, if any, required by the lease) as would entitle Landlord under its lease to terminate this lease or would cause without any further action of such Landlord, the termination of the lease or would entitle such Landlord to dispossess the Tenant thereunder, this lease shall not be terminated, nor shall Tenant's use, possession or enjoyment of the Demised Premises be interfered with, nor shall the leasehold estate granted by this lease be affected in any other manner, in any foreclosure or any action or proceeding instituted under or in connection with the Mortgage or in case the Mortgagee takes possession of the Mortgaged Premises pursuant to any provisions of the Mortgage, unless such Landlord would have had such right if the Mortgage had not been made, except that the person acquiring the interests of the Landlord as a result of any such action or proceeding, his successors and assigns shall not be (a) bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior Landlord, (b) bound by any amendment or modification of the lease made without Mortgagee's prior written consent, or (c) bound by any defaults of any prior Landlord.

(ii) (Attornment) If the interests of Landlord under the lease shall be transferred by reason of foreclosure or other proceedings for enforcement of the Mortgage, Tenant shall be bound to the purchaser ("Purchaser") under all of the terms, covenants and conditions of this lease for the balance of the term thereof remaining and any extensions or renewals thereof as provided in this lease, with the same force and effect as if the Purchaser were the Landlord under this lease, and Tenant does hereby attorn to the Purchaser, including the Mortgagee if it be the Purchaser, as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments upon Purchaser succeeding to the interest of the Landlord under this lease. The respective rights and obligation of Tenant and Purchaser upon such attornment, to the extent of the then remaining balance of the term of this lease and any such extensions and renewals, shall be and are the same as now herein set forth therein except as herein otherwise expressly provided.

(iii) (Subordination) Upon so agreeing with respect to such non-disturbance and attornment, this lease shall thereupon be and at all times thereafter continue to be subject and subordinate in each and every respect to the Mortgage and to any and all increases, renewals, modifications, extensions, substitutions and replacements of the Mortgage.

SECTION 24. **Defaults:** (a) In the event any one or more of the following events shall have occurred and shall not have been remedied as hereinafter provided: (1) The occurrence of any event set forth in Section 25 hereof, without the curing of same as therein provided; (2) Tenant's failure to pay any installment of basic annual rent or additional rent when the same shall be due and payable and the continuance of such failure for a period of ten (10) days after receipt by Tenant of notice in writing from Landlord specifying in detail the nature of such failure; or (3) Tenant's failure to perform any of the other covenants, conditions and agreements herein contained on Tenant's part to be kept or performed and the continuance of such failure without the curing of same for a period of thirty (30) days after receipt by Tenant of notice in writing from Landlord specifying in detail the nature of such failure and provided Tenant shall not cure said failure as provided in paragraph (b) of this Section 24; then, Landlord may, at its option, give to Tenant a notice of election to end the term of this lease upon a date specified in such notice,

18

which date shall be not less than ten (10) business days (Saturdays, Sundays and legal holidays excluded) after the date of receipt by Tenant of such notice from Landlord, and upon the date specified in said notice, the term and estate hereby vested in Tenant shall cease and any and all other right, title and interest of Tenant hereunder shall likewise cease without further notice or lapse of time, as fully and with like effect as if the entire term of this lease had elapsed, but Tenant shall continue to be liable to Landlord as hereinafter provided. Simultaneously with the sending of the notice to Tenant, hereinabove provided for, Landlord shall send a copy of such notice to any sublessee(s) of the Demised Premises, or portions thereof that Tenant may select, in writing, from time to time, and any additional persons or parties having an interest in the Demised Premises that Tenant may select, in writing, from time to time. The curing of any default(s) within the above time limits by any of the aforesaid parties or combination thereof, shall constitute a curing of any default(s) hereunder with like effect as if Tenant had cured same hereunder.

(b)    In the event that Landlord gives notice of a default of such a nature that it cannot be cured within such thirty (30) day period then such default shall not be deemed to continue so long as Tenant, after receiving such notice, proceeds to cure the default as soon as reasonably possible and continues to take all steps necessary to complete the same within a period of time which, under all prevailing circumstances, shall be reasonable. No default shall be deemed to continue if and so long as Tenant shall be so proceeding to cure the same in good faith or be delayed in or prevented from curing the same by any cause specified in Section 27 hereof.

(c)    Notwithstanding anything to the contrary contained in this Section 24, in the event that any default(s) of Tenant shall be cured in any manner hereinabove provided such default(s) shall be deemed never to have occurred and Tenant's rights hereunder shall continue unaffected by such default(s).

(d)    Upon any termination of the term of this lease pursuant to paragraph (a) of this Section 24, or at any time thereafter, Landlord may, in addition to and without prejudice to any other rights and remedies Landlord shall have at law or in equity re-enter the Demised Premises, and recover possession thereof and dispossess any or all occupants of the Demised Premises in the manner prescribed by the statute relying to summary proceedings, or similar statutes; but Tenant in such case shall remain liable to Landlord as hereinafter provided.

(e)    In case of any such default, reentry, expiration and/or dispossession by summary proceedings: (1) the rent shall become due thereupon and be paid up to the time of such re-entry, expiration and/or dispossession; (2) Landlord may relet the Demised Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent; and (3) Tenant or the legal representatives of Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to observe and perform Tenant's covenants herein contained any deficiency between the rent hereby reserved and/or covenanted on account of the lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this lease. In computing such liquidated damages, there shall be added to the said deficiency such reasonable expenses as Landlord may incur in connection with reletting, such as brokerage and preparation for reletting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord, at Landlord's option, may make such

19

alterations, repairs, replacements and/or decorations in the Demised Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of reletting the premises; and the making of such alterations, repairs, replacements and/or decorations shall not operate or be construed to release Tenant from liability hereunder as aforesaid. Landlord agrees to use its best efforts to mitigate all damages and to relet the Demised Premises in the event of any default specified herein.

SECTION 25. **Bankruptcy and Insolvency:** If, after the commencement of the term of this lease: (a) the Tenant then having the title to the leasehold estate created hereunder shall, while having such title, be adjudicated a bankrupt or adjudged to be insolvent; (b) a receiver or trustee shall be appointed for the aforesaid Tenant's property and affairs; (c) the aforesaid Tenant shall make an assignment for the benefit of creditors or shall file a petition in bankruptcy or insolvency or for reorganization or shall make application for the appointment of a receiver; or (d) any execution or attachment shall be issued against the aforesaid Tenant or any of the aforesaid Tenant's property, whereby the Demised Premises or any building or buildings or any improvements thereon shall be taken or occupied or attempted to be taken or occupied by someone other than the aforesaid Tenant, except as may herein be permitted, and such adjudication, appointment, assignment, petition, execution or attachment shall not be set aside, vacated, discharged or bonded within one hundred and twenty (120) days after the issuance of the same, then a default hereunder shall be deemed to have occurred so that the provisions of Section 24 hereof shall become effective and Landlord shall have the rights and remedies provided for therein. Notwithstanding anything to the contrary hereinabove contained, upon the occurrence of a default pursuant to this Section 25, if the rent due and payable hereunder shall continue to be paid and the other covenants, conditions and agreements of this lease on Tenant's part to be kept and performed shall continue to be kept and performed, no event of default shall have been deemed to have occurred and the provisions of Section 24 hereof shall not become effective.

SECTION 26. **Waivers:** Failure of Landlord or Tenant to complain of any act or omission on the part of the other party no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder. No waiver by Landlord or Tenant at any time, express or implied, of any breach of any provision of this lease shall be deemed a waiver of any provision of this lease or a consent to any subsequent breach of the same or any other provision. No acceptance by Landlord of any partial payment shall constitute an accord or satisfaction but shall only be deemed a part payment on account.

SECTION 27. **Force Majeure:** In the event that Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder (except the payment by Tenant of basic annual rent or additional rent or other charges hereunder) by reason of Acts of God, strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control, then performance of such act shall be excused for the period of the delay (up to a maximum period of sixty (60) days) and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

SECTION 28. **Notices:** Every notice, approval, consent or other communication authorized or required by this lease shall not be effective unless same shall be in writing and sent postage prepaid by United States registered or certified mail, return receipt requested, directed to the other party at its address hereinabove first mentioned, or such other address as either party may designate by notice given from time to time in accordance with this Section 28. The rent payable by Tenant hereunder shall be paid to Landlord at the

same place where a notice to Landlord is herein required to be
directed.

SECTION 29. **Certificate:** Either party shall, without
charge, and without expense of Landlord, at any time and from time to
time hereafter, within ten (10) days after written request of the
other, certify by written instrument duly executed and acknowledged
to any mortgagee or purchaser, or proposed mortgagee or proposed
purchaser, or any other person, firm or corporation specified in such
request: (a) as to whether this lease has been supplemented or
amended, and if so, the substance and manner of such supplement or
amendment; (b) as to the validity and force and effect of this lease,
in accordance with its tenor as then constituted; (c) as to the
existence of any default thereunder; (d) as to the existence of any
offsets, counterclaims or defenses thereto on the part of such other
party; (e) as to the commencement and expiration dates of the term of
this lease, and (f) as to any other matters as may reasonably be so
requested. Any such certificate may be relied upon by the party
requesting it and any other person, firm or corporation to whom
the same may be exhibited or delivered, and the contents of such
certificate shall be binding on the party executing same.

SECTION 30. **Governing Law:** This lease and the performance
thereof shall be governed, interpreted, construed and regulated by the
laws of the State of South Carolina.

SECTION 31. **Partial Invalidity:** If any term, covenant,
condition or provision of this lease or the application thereof to any
person or circumstance shall, at any time or to any extent, be invalid
or unenforceable, the remainder of this lease, or the application of
such term or provision to persons or circumstances other than those
as to which it is held invalid or unenforceable, shall not be affected
thereby, and each term, covenant, condition and provisions of this
lease shall be valid and be enforced to the fullest extent permitted
by law.

SECTION 32. **Short Form lease:** The parties will at any time,
at the request of either one, promptly execute duplicate originals of
an instrument, in recordable form, which will constitute a short form
lease, setting forth a description of the Demised Premises, the term
of this lease and any other portions thereof, excepting the rental
provisions, as either party may request.

SECTION 33. **Interpretation:** Wherever herein the singular
gender is used, the same shall include the plural, and the masculine
gender shall include the feminine and neuter genders, and vice versa,
as the context shall require. The section headings used herein are
for reference and convenience only, and shall not enter into the
interpretation hereof. This lease may be executed in several counter
parts, each of which shall be an original, but all of which shall
constitute one and the same instrument. The term "Landlord" and
"Tenant" whenever used herein shall mean only the owner at the time
of Landlord's or Tenant's interest herein, and upon any sale or
assignment of the interest of either Landlord or Tenant herein, their
respective successors in interest and/or assigns, shall during the
term of their ownership of their respective estates herein, be deemed
to be Landlord or Tenant, as the case may be.

SECTION 34. **Entire Agreement:** No oral statement or prior
written matter shall have any force or effect. Tenant agrees that it
is not relying on any representations or agreements other than those
contained in this lease. This agreement shall not be modified or
cancelled except by writing subscribed by all parties.

SECTION 35. **Miscellaneous Provisions:**

(a) In the event Landlord shall sell the entire
Shopping Center to a bona fide purchaser who shall assume all
obligations herein imposed upon the Landlord, then in such event the

21

Landlord's liability under this lease shall terminate upon registration of the deed of conveyance, except that Landlord shall not be released from the obligation to provide Building Allowance. It is specifically understood and agreed that there shall be no personal liability of Landlord (nor Landlord's agent, if any) in respect to any of the covenants, conditions or provisions of this lease except for Landlord's obligation to pay to Tenant the Building Allowance as set forth in subsection 7(c) hereof. In the event of a breach or default by Landlord of any of its obligations under this lease, Tenant shall look solely to the equity of the Landlord in the Shopping Center for the satisfaction of Tenant's remedies and to the right to offset against rentals for sums otherwise due to Tenant from Landlord. If a default of Landlord remains uncured following notice and an opportunity to cure said default given by Tenant to Landlord and to each of Landlord's mortgagees of which Tenant has notice, Tenant shall have the right to terminate this lease. The cure period shall be not less than thirty (30) days. In the event Tenant gives notice of a default which is of such a nature that it cannot be cured within said thirty (30) day period, then the provisions of subsection 24(b) hereof shall apply to such default and to an extension of the period of time available for the cure thereof.

(b)  It is agreed that the Tenant in connection with the construction of the improvements contemplated herein shall be permitted to utilize a portion of the shopping center for its construction staging area which area shall be limited to the Construction Staging Area to be designated by Landlord.

(c)  Any party who unreasonably fails to perform any covenant of this agreement shall pay to the other party reasonable attorney's fees and expenses reasonably incurred or sustained by such other party in enforcing performance by the other party.

(d)  Upon Landlord's written request, Tenant and any guarantor of the Tenant's obligations under this lease shall promptly furnish Landlord, from time to time, its most recent financial statements in reasonable detail prepared by an independent Certified Public Accountant and certified by Tenant or the guarantor reflecting Tenant's or the guarantor's financial condition.

(e)  Tenant shall sweep and clean the sidewalks on the Demised Premises and shall provide and maintain insect and rat proof refuse receptacles for any refuse stored on, or in the rear of the Demised Premises. It is further agreed by the parties hereto that Landlord has the privilege, in the event of Tenant's neglecting and not maintaining Demised Premises, after giving Tenant five (5) days' written notice, to order such repairs and sweeping and cleaning of sidewalks as are deemed necessary by Landlord and to charge the cost of same to Tenant. Said cost amount shall be billed to Tenant and due when the next month's rent is due.

(f)  Landlord and Tenant hereby acknowledge and warrant that there are no brokers representing the parties to this lease.

(g)  Landlord shall indemnify and hold Tenant harmless from and against any and all claims for broker's commissions made by brokers or any other party if such commission was incurred by Landlord.

(h)  Tenant shall indemnify and hold Landlord harmless from and against any and all claims for broker's commissions made by brokers or any other party if such commission was incurred by Tenant.

(i)  This agreement may be simultaneously executed in several counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

22

(j)  Tenant's use of the Demised Premises and the exterior common areas shall be subject at all times during the Term to reasonable rules and regulations adopted by Landlord not in conflict with any of the express provisions hereof governing the use of the parking areas, malls, walks, driveways, passageways, signs, exteriors of buildings, lighting and other matters affecting other tenants in and the general management and appearance of the Shopping Center.  Tenant agrees to comply with all such rules and regulations upon notice to Tenant from Landlord; provided, however, such rules and regulations shall not adversely affect access to the Demised Premises or Tenant's use of the improvements constructed thereon.  In the event Tenant fails to comply with such rules and regulations or any of the other covenants set forth in this Section after notice from Landlord of this non-compliance, then Tenant shall pay to Landlord as additional rent, the sum of Fifty Dollars ($50.00) for each violation, acceptance of such additional rent to be without prejudice to any other rights or remedies available to Landlord.  Each day on which a violation occurs or continues shall be a separate violation.  Tenant expressly agrees as follows:

(i)  All garbage and refuse shall be kept inside the Demised Premises in the kind of container specified by Landlord, and shall be placed outside of the Demised Premises prepared for collection in the manner and at the times and places specified by Landlord.  If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost.  Tenant shall pay the cost of removal of any of Tenant's refuse and garbage and maintain all common loading areas in a clean manner satisfactory to the Landlord.  If any part of the Tenant's business shall consist of the preparation and/or sale of food, including without limitation the operation of a restaurant, snack shop or food market, Tenant shall provide garbage containers at Tenant's expense for the disposal of its food scraps and refuse.  Tenant shall use any trash compactor Landlord provides for the general use of Tenant or tenants in a designated area of the Shopping Center.

(ii)  No radio or television aerial or other device (including a satellite disk) shall be erected on the roof or exterior walls of the Demised Premises or the building in which the Demised Premises are located without first obtaining in each instance the Landlord's consent in writing which consent shall not be unreasonably withheld, delayed or denied.  Any aerial or device installed without such written consent shall be subject to removal at Tenant's expense without notice at any time.

(iii)  No loud speakers, televisions, phonograph, radios, tape players or other devices shall be used in a manner so as to be heard or seen outside of the Demised Premises without the prior written consent of Landlord, nor shall Tenant solicit business or distribute advertising or promotional material in the exterior common areas.

(iv)  Tenant's heating and air conditioning system for the Demised Premises shall be designed so as to prevent the drawing of heated or cooled air from any enclosed mall and to keep the Demised Premises heated or air conditioned, as the case may be, at least to the same minimum temperature in the case of heat and to the same maximum temperature in the case of air conditioning, as the Landlord is endeavoring to maintain in the enclosed mall area.  Notwithstanding the foregoing, upon written notice to Tenant, Landlord may require Tenant to maintain a slight negative air pressure to prevent concession stand odors from escaping from the Demised Premises into the common areas of the Shopping Center.

(v)  The plumbing facilities shall not be used for any other purpose than that for which they are constructed; no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant.  All grease traps, if any, shall

23

be installed and maintained in accordance with applicable law and in accordance with Landlord's requirements.

(vi)    Tenant at its expense shall contract for termite and pest extermination services covering the Demised Premises, to be rendered as needed but at least annually.

(vii)    Tenant shall not burn any trash or garbage of any kind in the Demised Premises, the Shopping Center, or within three (3) miles of the Shopping Center.

(viii)    Tenant shall keep any display windows or signs in or on the Demised Premises well lighted during such hours and days that any enclosed mall in the Shopping Center is lighted by Landlord.

(ix)    Tenant shall keep and maintain the Demised Premises (including, without limitation, exterior and interior portions of all windows, doors and all other glass) in a neat and clean condition.

(x)    Tenant shall take no action which would violate Landlord's labor contracts, if any, affecting the Shopping Center, nor create any work stoppage, picketing, labor disruption or dispute, or any interference with the business of Landlord or any other tenant or occupant in the Shopping Center or with the rights and privileges of any customer or other person(s) lawfully in and upon said Shopping Center, nor shall Tenant cause any impairment or reduction of the good will of the Shopping Center.  Tenant, its general contractor and sub-contractor shall execute a labor disharmony letter setting forth the aforesaid covenants prior to commencement of construction in the Demised Premises.

(xi)    Tenant shall pay before delinquency all license or permit fees and charges of a similar nature for the conduct of any business in the Demised Premises.

(xii)    Tenant shall use the Shopping Center name as same may be changed from time to time, in referring to the location of the Demised Premises in all newspaper, radio and television or other advertising.

(xiii)    Tenant shall store and/or stock in the Demised Premises only such merchandise as Tenant is permitted to offer for sale in the Demised Premises pursuant to this lease.

(xiv)    Tenant shall not conduct or permit any fire, bankruptcy, auction or "going out of business" sale (whether real or fictitious) in the Demised Premises, or utilize any unethical method of business operation.

(xv)    Tenant shall not perform any act or carry on any practice which may damage, mar or deface the Demised Premises or any other part of the Shopping Center.

(xvi)    Tenant shall not use any forklift truck, tow truck, or any other powered machine for handling freight in the Shopping Center except in such manner and in those areas in the Shopping Center as may be approved by Landlord in writing.  All such equipment shall have rubber wheels only.

(xvii)    Tenant shall not place a load on any floor in the interior delivery system, if any, or in the Demised Premises, or in any area of the Shopping Center, exceeding the floor load which such floor was designed to carry, nor shall Tenant install, operate or maintain therein any heavy item or equipment except in such manner as to achieve a proper distribution of weight.

(xviii)    Tenant shall not install, operate or maintain in the Demised Premises or in any other area of the Shopping Center any

24

electrical equipment which does not bear underwriter's approval, or which would overload the electrical system or any part thereof beyond its capacity for proper and safe operation as determined by Landlord.

(xix)  Tenant shall not suffer, allow or permit any vibration, noise, light, odor or other effect to emanate from the Demised Premises, or from any machine or other installation therein, or otherwise suffer, allow or permit the same to constitute a nuisance or otherwise interfere with the safety, comfort and convenience of Landlord or any of the other occupants of the Shopping Center or their customers, agents or invitees or any others lawfully in or upon the Shopping Center.  Upon notice by Landlord to Tenant that any of the aforesaid is occurring, Tenant agrees to forthwith remove or control the same.

(xx)  Tenant shall not store, display, sell or distribute any alcoholic beverages or any dangerous materials (including without limitation fireworks) unless specifically permitted in this lease.

(xxi)  Tenant shall not use or occupy the Demised Premises or do or permit anything to be done thereon in any manner which shall prevent Landlord and/or Tenant from obtaining at standard rates any insurance required or desired, or which would invalidate or increase the cost to Landlord of any existing insurance, or which might cause structural injury to any building, or which would constitute a public or private nuisance or which would violate any present or future laws, regulations, ordinances or requirements (ordinary or extraordinary, foreseen or unforeseen) of the federal, state or municipal governments, or of any department, subdivisions, bureaus or offices thereof, or of any other governmental public or quasi-public authorities now existing or hereafter created having jurisdiction in the Demised Premises or the Shopping Center of which they form a part.  Landlord hereby acknowledges that use of the Demised Premises as a motion picture theater shall not be deemed to increase Landlord's insurance above standard rates.

(k)  The parties acknowledge that the realization of the benefits of a percentage rent lease are dependent upon Tenant's maximizing its Gross Sales, and that self- competition is inconsistent with the generation of maximum Gross Sales.  The parties further acknowledge that the Minimum Annual Rent was negotiated together with and giving consideration to the Percentage Rent rate and base and that self-competition by Tenant will deprive Landlord of a bargained-for consideration.  Accordingly, Tenant covenants and agrees that during the term and any extension or renewals thereof Tenant will not, directly or indirectly, engage in any business similar to or in competition with that for which the Demised Premises are let, within a radius of three (3) miles of the Shopping Center, measured from the perimeter of the Shopping Center, without Landlord's prior written consent. The covenant of the preceding sentence shall be inapplicable to any business of Tenant (i) existing as of the date hereof, provided the nature and character of such business remains the same and is continuously operated at the same location, (ii) acquired after the date hereof, provided Tenant operates both the Demised Premises and the new theaters on an equal basis with respect to the mixture and quality of films exhibited, the price of admission to each facility and the advertising budgets therefor on a per seat basis and (iii) acquired as the result of a sale by Tenant of its interest in the lease as a part of a transfer by Tenant to a purchaser of Tenant's interest in properties containing not less than forty (40) screens. If tenant shall breach the covenant contained in this subsection 35(k), then in addition to the rights and remedies provided in Section 24 of this lease, Landlord may, at its option, either (i) terminate this lease upon thirty (30) days' written notice to Tenant, or (ii) enjoin the operation of the violative store of Tenant, or (iii) include all gross sales generated by any violative store of Tenant in calculating the percentage rent due under this lease.

25

(1)(i) Tenant covenants and agrees to contribute to a Marketing Fund, if any, formed by Landlord for the purpose of paying for advertising and sales promotions for the Shopping Center. In such event, Tenant agrees to pay to Landlord a "Marketing Charge" as described in subparagraph (b) below, and the Marketing Charge paid by Tenant and other tenants of the Shopping Center will be deposited into the Marketing Fund. The Marketing Fund will be used by Landlord to pay all costs and expenses for the promotion of the Shopping Center, which may include, without limitation, special events, shows, displays, signs, seasonal events, institutional advertising for the Shopping Center, promotional literature and other activities designed to attract customers to the Shopping Center. Landlord shall have the right to retain revenue from income producing events whether or not conducted for promotional purposes or by or through the Merchants Association or Marketing Fund. The Marketing Fund may also be used to pay the costs and expenses of administration of the Marketing Fund including, without limitation, the salary of the Marketing Director and related administrative personnel, rent and insurance. Landlord shall have the right to employ or cause to be employed all promotional services and personnel which, in Landlord's judgment, are necessary to administer the Marketing Fund and operate such promotional activities. Such personnel shall be under the exclusive control and supervision of Landlord who shall have the sole authority to employ and discharge such personnel. Landlord shall make an annual contribution to the Marketing Fund in an amount equal to twenty-five percent (25%) of the aggregate annual contributions actually paid by the tenants and other occupants of the Shopping Center. Landlord may elect, at its option, to contribute all or part of the services of the Director and related administrative personnel in lieu of all or part of Landlord's aforesaid cash contribution. Landlord's obligations under this paragraph shall not bind Landlord's mortgagee(s) or any purchaser at a foreclosure sale. Landlord may appoint a committee comprised of representatives of Landlord, a representative of each department store, and an equal number of representatives of the other tenants in the Shopping Center, to discuss the advertising and promotional activities sponsored by the Shopping Center. The failure of any other tenant in the Shopping Center to contribute to the Marketing Fund shall not in any way release Tenant from Tenant's obligations hereunder, such obligations being a separate and independent covenant of this lease. Tenant shall pay to Landlord, as additional rent, in equal monthly installments in advance on the first day of each calendar month of the Term as a Marketing Charge, the amount of Five Hundred Dollars ($500.00) per year.

(ii) Tenant covenants and agrees to become and remain a member in good standing of any Merchants Association now existing or which may hereafter be organized in the Shopping Center in lieu of a Marketing Fund which is recognized by Landlord as the Merchants Association for the Shopping Center. Landlord shall have the right to employ, discharge, replace and establish from time to time the compensation of the Director and/or Executive Secretary of the Association. Tenant agrees to pay minimum dues to the Merchants Association in the amount per month as set forth in subsection 35(1)(i). Landlord shall make an annual contribution to said Merchants Association in an amount equal to twenty-five percent (25%) of the aggregate annual contributions actually paid by all other members thereof. Landlord may elect, at its option, to contribute all or part of the services of the Director and/or Executive Secretary of the Association in lieu of all or part of Landlord's aforesaid cash contribution. Notwithstanding the foregoing, Landlord shall not be obligated to make its contribution for any calendar year until the Merchants Association shall have delivered to Landlord satisfactory evidence of the amount of dues it has received and a copy of its operating budget and such other financial data as Landlord shall request. Landlord's obligations under this paragraph shall not bind Landlord's mortgagee(s) or any purchaser at a foreclosure sale. The failure of any other tenant in the Shopping Center to become or remain a member in good standing of the Merchants Association shall not in

26

any way release Tenant from Tenant's obligations hereunder, such obligations being a separate and independent covenant of this lease.

    SECTION 36. **Parties:** Except as herein expressly provided, the covenants, conditions and agreements contained in this lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs and assigns.

    IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

WITNESSES:

LANDLORD:

COASTAL LIMITED PARTNERSHIP, By
CBL Management, Inc., General Partner

By _____
                    V.P.

Attest: _____
              Asst. Secretary

TENANT:

LITCHFIELD THEATRES, LTD.

By _____

Attest:

_____

27

STATE OF TENNESSEE
COUNTY OF HAMILTON

      Personally appeared before me _Debra J. Curtis_, who on oath says that ᴕhe saw the within named CBL Management, Inc., as General Partner of Coastal Limited Partnership by _Jay Winston_ its Vice President and _Ross Zimmerman II_ its Assistant Secretary, sign the within instrument, and the said corporation, by said officers, seal said instrument, and as its act and deed of said partnership deliver the same, and ᴕhe with _Carol A. Pappas_ witnessed the execution thereof.


_Debra J. Curtis_

SWORN and subscribed before me
this _10th_ day of _March_,
19_89_.

_Susan E. Mangum_
Notary Public for _Hamilton_
County, _Tennessee_

My commission expires:

_10-13-91_


STATE OF SOUTH CAROLINA
COUNTY OF GREENVILLE

      Personally appeared before me _Carolyn B. Lowe_, who on oath says that _s_he saw the within named Litchfield Theatres, Ltd. by _William M. Webster III_ its President and _____ its Secretary, sign the within instrument, and the said corporation, by said officers, seal said instrument, and as its act and deed deliver the same, and _s_he with _Charles E. McDonald Jr._ witnessed the execution thereof.


_Carolyn B. Lowe_

SWORN and subscribed before me
this _22_ day of _February_,
19_89_.

_Charles E. McDonald_
Notary Public for _South Carolina_
County, _____

My commission expires:

_10/17/89_

28



INLET SQUARE
MURRELLS INLET, SOUTH CAROLINA

CBL & ASSOCIATES, INC.
CHATTANOOGA, TENNESSEE

BUILDING STORE "A"

FUTURE BUILDING STORE "A"

FUTURE SMALL SHOPS

BUILDING STORE "B"

BUILDING STORE "C"

LEASE EXHIBIT "A" SITE PLAN

SHEET 1 OF 2

NOT TO SCALE



# INLET SQUARE
## MURRELLS INLET, SOUTH CAROLINA

NOTES:
1. THIS EXHIBIT IS DIAGRAMMATIC AND INTENDED ONLY FOR THE PURPOSE OF INDICATING THE LOCATION OF THE DEMISED PREMISES IN THE PROJECT. IT DOES NOT PURPORT TO SHOW EXACT OR FINAL LOCATION OF, COLUMNS, DIVISION WALLS OR OTHER REQUIRED ARCHITECTURAL, STRUCTURAL, MECHANICAL, OR ELECTRICAL ELEMENTS. THE LESSOR RESERVES THE RIGHT TO ELIMINATE OR ADD AND TO MAKE CHANGES IN THE SIZE OR LOCATION OF SUCH ELEMENTS AS MAY BE REQUIRED FROM TIME TO TIME.
2. DIMENSIONS INDICATED FOR THE DIMSED PREMSES ARE MEASURED TO THE CENTER LINE OF INTERIOR AND PARTY WALLS AND TO THE EXTERIOR FACE OF EXTERIOR WALLS, CORRIDOR WALLS AND TO MALL LEASE LINE.
3. WHERE CODES REQUIRE ALCOVES FOR EXIT DOORS INTO SERVICE OR FIRE CORRIDORS, SUCH ALCOVES SHALL BE CONSIDERED AS PART OF THE LEASE PREMSE.

SHEET 2 OF 2

## CBL & ASSOCIATES
### CHATTANOOGA, TENNESSEE

LEASE EXHIBIT "A"

BUILDING STORE "A"

BUILDING STORE "B"

BUILDING STORE "C"

FUTURE DEPT. STORE

FUTURE SMALL SHOPS

FOOD COURT

Theatre

29-A

## Exhibit "B"

## SIGN CRITERIA

(i)   Signs are to be furnished and installed by Tenant and approved by Landlord's architect.  Tenant's sign contractor or architect must submit a colored rendering of Tenant's signs prior to approval.  Tenant's sign shall be located within the limits of the Tenant's store front and shall not project more than eight (8") inches beyond the store front.

Sign size:

| | | |
|---|---|---|
| (A) | Up to 30' store front | -Capitals  -18"<br>-Lower Case -12" |
| (B) | 30'1" to 60' store front | -Capitals  -24"<br>-Lower Case -18" |

(ii)   Length of Tenant's sign shall be limited to seventy (70%) percent of Tenant's sign panel.  Limits of sign placement on store front shall be as designated by Landlord.

(iii)  All conduit, wiring for, and connection to, the sign shall be furnished by Tenant.

(iv)   No flashing signs or exposed neon tubing permitted.

(v)    No exterior signs permitted except as permitted by Landlord.

(vi)   All signs shall be composed of individually lighted, separate letters or an imaginative sign panel, integrated with the store front design.

(vii)  Tenant shall furnish and install in a convenient location above the sign panel, specified above, one (1) 110-volt electrical outlet for use with seasonal promotions.

(viii) Tenant shall paint its name on their service door in 3" Helvetica medium style letters and the color shall match Sherwin Williams #BM5-24.

(ix)   Tenant's exterior signs may include (in addition to the pylon sign described in Section 13 of the lease) an identification sign and readerboard to be installed on an exterior wall of the Demised Premises in a location approved by Landlord.

(x)    The size, location, content, materials and structure of any identification signs and/or readerboards proposed by Tenant for installation upon the wall of the Demised Premises attached to the enclosed mall shall be subject to the prior approval of Landlord.

30

EXHIBIT "C"

TITLE EXCEPTIONS

1.  Leasehold Building Loan Mortgage, Assignment of Leases and
    Rents and Security Agreement granted by Coastal Limited
    Partnership to The Chase Manhattan Bank (National Association)
    dated November 17, 1988, recorded in the R.M.C. Office of
    Horry County, South Carolina in Mortgage Book 1408, Page 564,
    securing an indebtedness in the original principal amount of
    $31,000,000.00.

2.  UCC-1 Financing Statement from Coastal Limited Partnership as
    Debtor to The Chase Manhattan Bank, N.A., as Secured Party,
    filed in the Office of Secretary of State for the State of
    South Carolina in File No. 88-060494 on November 18, 1988.

3.  UCC-1 Financing Statement from Coastal Limited Partnership as
    Debtor to The Chase Manhattan Bank, N.A., as Secured Party,
    filed in the R.M.C. Office of Horry County, South Carolina as
    File No. 106750 on November 18, 1988 at 2:13 p.m.

4.  Ground Lease between Tad's Land and Development Company, Inc.
    and Gerald A. Tadlock, collectively as Landlord, and Coastal
    Limited Partnership, as Tenant dated January 21, 1988 as
    evidenced by a Memorandum of Lease dated January 21, 1988,
    recorded in the Office of the Clerk of Court for Horry County,
    South Carolina in Deed Book 1193, Page 250, as amended by
    First Amended Memorandum of Lease dated November 4, 1988,
    recorded in Deed Book 1266, Page 695 in the R.M.C. Office for
    Horry County, South Carolina.

5.  Lease Agreement between Charlie Sing, Carrie W. Sing and
    Charlie James Sing as Lessor and Kenneth D. Anderson as Lessee
    recorded in the Office of the Clerk of Court for Horry County,
    South Carolina in Deed Book 815, Page 249, assigned by
    Assignment of Leases between Kenneth D. Anderson as Assignor
    and Gerald A. Tadlock as Assignee dated January 15, 1987 and
    recorded in the Office of the Clerk of Court for Horry County,
    South Carolina in Deed Book 1109, Page 738, as amended by
    Amendment of Lease Agreement dated September 15, 1987 and
    recorded in the Office of the Clerk of Court for Horry County,
    South Carolina in Deed Book 1173, Page 341, and Landlord's
    Non-Disturbance Agreement entered into by Charlie Sing and
    Charlie James Sing as Fee Owner, Gerald A. Tadlock as
    Groundlessee and Coastal Limited Partnership, as Sublessee
    dated September 15, 1987 and recorded in the Office of the
    Clerk of Court for Horry County, South Carolina in Deed Book
    1193, Page 296 on January 21, 1988.

6.  Lease Agreement between Jim T. Jordan, Dorothy Mason Jordan,
    Marian J. Thomson, Connie J. Koloditch and Steven T. Jordan
    as Lessor and Tad's Land and Development Co., Inc. as Lessee
    dated January 27, 1983 and recorded in the Office of the Clerk
    of Court for Horry County, South Carolina in Deed Book 793,
    Page 776, as amended by First Amendment to Lease Agreement
    dated July 8, 1987 and recorded in the Office of the Clerk of
    Court for Horry County, South Carolina, in Deed Book 1153,
    Page 201, and Landlord's Non-Disturbance Agreement entered
    into by Jim T. Jordan, et al as Fee Owner, Tad's Land and
    Development Co., Inc. as Goundlessee and Coastal Limited
    Partnership, as Sublessee dated September 18, 1987 and
    recorded in the Office of the Clerk of Court for Horry County,
    South Carolina in Deed Book 1193, Page 286 on January 21,
    1988.

7.  Easement granted to the South Carolina Public Service
    Authority dated November 14, 1950 and recorded in the Office

31

of the Clerk of Court for Horry County, South Carolina in Deed
Book 88, Page 197.

8. Easement granted to the South Carolina Public Service
authority dated November 7, 1950 and recorded in the Office
of the Clerk of Court for Horry County, South Carolina in Deed
Book 88, Page 201.

9. Right-of-way granted to South Carolina Public Service
Authority dated June 18, 1984 and recorded in the Office of
the Clerk of Court for Horry County, South Carolina in Deed
Book 898, Page 178.

10. Sewer Line Easement contained in Reciprocal Easements and
Restrictions Agreement dated May 24, 1984 entered into by CBL
Management, Inc. and Gerald A. Tadlock recorded in the Office
of the Clerk of Court for Horry County, South Carolina in Deed
Book 871, Page 174.

11. Easement granted by Charlie Sing to the South Carolina Public
Service Authority dated July 14, 1964 recorded in the Office
of the Clerk of Court for Horry County, South Carolina in Deed
Book 309, Page 378.

12. Easement granted by Charlie Sing to the South Carolina Public
Service Authority dated November 1, 1950 recorded in the
Office of the Clerk of Court for Horry County, South Carolina
in Deed Book 88, Page 191.

13. Easement granted by S. T. Jordan to the South Carolina Public
Service Authority dated October 26, 1950 and recorded in the
Office of the Clerk of Court for Horry County, South Carolina
in Deed Book 88, Page 193.

14. Easements sewerlines and waterlines as shown on plat prepared
by David W. Barnes, RLS, dated October 10, 1988.

15. Rights-of-Way dated December 22, 1988, from Charlie Sing and
Charlie James Sing to the South Carolina Public Service
Authority.

16. Rights-of-Way dated December 28, 1988, from Tad's Land and
Development Company, Inc. and Gerald A. Tadlock to the South
Carolina Public Service Authority.

17. Rights-of-Way dated December 28, 1988, from Jim T. Jordan,
et. al. to the South Carolina Public Service Authority.

18. Reciprocal Easement Agreement dated December 15, 1988, between
Coastal Limited Partnership and Carolina G.S.M. Associates,
L.P.

19. Taxes for 1989 and subsequent years.

GUARANTY OF LEASE

In consideration of the foregoing Lease between COASTAL LIMITED PARTNERSHIP, a South Carolina limited partnership, by CBL MANAGEMENT, INC., as Landlord and LITCHFIELD THEATRES, LTD., a South Carolina corporation, as Tenant and to induce Landlord to enter into said Lease, the undersigned, jointly and severally if there be more than one (collectively, "Guarantor"), covenants and agrees as follows:

1.    Guarantor hereby unconditionally and absolutely guarantees to Landlord the prompt and full payment of rent and all other sums due to Landlord under said Lease and the prompt and complete performance of all covenants contained in said Lease on the Tenant's part to be performed. Guarantor agrees to indemnify and hold Landlord harmless from any loss, costs or damages arising out of Tenant's failure to pay the aforesaid rent and other sums and/or the Tenant's failure to perform any of the aforesaid covenants.

2.    Guarantor waives extension of time of payment or performance, and notice of acceptance of this Guaranty.

3.    Guarantor agrees that its obligations hereunder are primary and agrees that this Guaranty may be enforced by Landlord without first resorting to or exhausting any other remedy, security or collateral; provided, however, that nothing herein contained shall prevent Landlord from suing on the aforesaid obligations with or without making the Guarantor a party to the suit or exercising any other rights under said Lease, and if such suit or any other remedy is availed of only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the aforesaid obligations. No action brought under this Guaranty and no recovery in pursuance thereof shall be a bar or defense to any further action which may be brought under this Guaranty by reason of any further default(s) hereunder or in the performance and observance of the terms, covenants and conditions of said Lease. Guarantor hereby submits to personal jurisdiction in the state where the Leased Premises are located for the enforcement of this Guaranty, and waives any and all personal rights under the laws of any state to object to jurisdiction within the state where the Leased Premises are located for the purposes of litigation to enforce this Guaranty.

4.    Guarantor agrees that the Guarantor's obligation to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Tenant or its estate in bankruptcy (including without limitation any rejection of the Lease by Tenant or by any Trustee or Receiver in bankruptcy) resulting from the operation of any present or future provision of the National Bankruptcy Act, other similar statute, or from the decision of any court.

5.    Guarantor agrees that in the event this Guaranty is placed in the hands of an attorney for enforcement, the Guarantor will reimburse Landlord for all expenses incurred, including reasonable attorney's fees.

6.    Anything contained herein to the contrary notwithstanding, it is expressly understood and agreed that Landlord shall give Guarantor written notice of each and every default by Tenant under said Lease simultaneously with the giving of such notice to Tenant as required thereunder and Landlord shall recognize Guarantor's right to cure any such default on behalf of Tenant. The notices required to be given by Landlord to Guarantor shall be only those required by Landlord to be given to Tenant under said Lease. All notices to be given Guarantor hereunder shall be sent to:

The Litchfield Company of South Carolina
   Limited Partnership
Post Office Drawer 100
Easley, South Carolina  29641-0100
Attention:  W. M. Webster, III

7.    Guarantor shall not be bound by any amendments or modifications to said Lease unless Guarantor receives written notice thereof and consents in writing thereto.

8.  Guarantor agrees that this Guaranty shall inure to the benefit of and may be enforced by Landlord, its successors and assigns and any mortgagee(s) of the Leased Premises, and shall be binding and enforceable against the Guarantor and the Guarantor's legal representatives, successors and assigns.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty this 22nd day of February , 1989 .

GUARANTOR:  THE LITCHFIELD COMPANY OF SOUTH CAROLINA LIMITED PARTNERSHIP

BY:  LITCHFIELD ENTERPRISES, INC.

W. M. Webster, III, President

and

W. M. Webster, III

"General Partners"

STATE OF <u>SOUTH CAROLINA</u>

COUNTY OF <u>GREENVILLE</u>

    Before me, <u>Carolyn B. Lowe</u>, of the state and county aforesaid,
personally appeared <u>W. M. Webster, III</u>, with whom I am personally
acquainted (or proved to me on the basis of satisfactory evidence), and who,
upon oath, acknowledged <u>him</u>self to be a partner of <u>Guarantor</u>,
the within named bargainor, a partnership, and that <u>he</u> as such partner, being
authorized so to do, executed the foregoing instrument for the purpose therein
contained by signing the name of the partnership by <u>him</u>self as a partner.

    WITNESS my hand and seal, this <u>22nd</u> day of <u>February</u>, 1989.

                                   *Carolyn B. Lowe*
                              Notary Public   for South Carolina

My commission expires:
   <u>2/28/93</u>

## STATEMENT OF ACCOUNT

CURRENT UNPAID EXPENSES AND RENT $247,287.30

MONTHLY ACCRUAL GOING FORWARD $49,457.46

PERSONALLY appeared before me Heather Gray, Property Manager of Inlet Retail Associates, LLC, who first being duly sworn and deposed, states that the foregoing is a true and correct statement of the unpaid rent and expenses owed to the Inlet Retail Associates, LLC by Regal Cinemas, Inc. pursuant to the Lease Agreement entered into between the parties and attached to the Complaint filed in this matter.   The affiant further states that no part of the same has been paid by discount or otherwise.  Additionally, the affiant states that the account shall continue to accrue at a monthly rate of $49,457.46.

FURTHER AFFIANT SAYETH NOT.

Heather Gray

SWORN to and subscribed before me

this 7th day of August , 2009

_____(L.S.)

Notary Public for_____

My Commission Expires February 24, 2014
My Commission Expires: _____

